1809.

*Philadelphia,*
*Tuesday,*
December 26.

### LIPPINCOTT and ANNESLY *against* BARKER.

An assignment
by a debtor of
all his property
to trustees for
the benefit of
such creditors
as should within
a given time
execute a re-
lease of all de-
mands, is good
if certain of the
creditors agree
to accept it upon
that condition,
and is a transfer
of the property
for their use,
from the time of
acceptance. If
therefore a *fi.*
*fa.*, issued after
the acceptance
but before the
execution of a
release by any
creditor, be levi-
ed upon the
goods assigned,
the sheriff is a
trespasser.
   *Quære* whe-
ther an assign-
ment stipulating
for a release, is
valid upon gene-
ral principles.

| 2 B | 174 |
| 187 US | 46 |

TRESPASS against the sheriff of *Philadelphia* county for taking in execution the goods of the plaintiffs.

Upon the trial of this cause in *March* 1805, the material facts in evidence were these: In *May* 1802 *William Lawrance* was appointed by the guardians of the poor, a collector of the poor tax for that year, and gave an official bond with *Joseph Bispham* and *Robert Erwin* as his sureties. In *May* 1803 he was re-appointed, and with the same sureties gave a similar bond, which was filed in the office of the prothonotary of the Common Pleas on the 10th *June* 1803. In *December* following, *Lawrance* was found to be in arrear upon both duplicates; and in *March* 1804 an execution was issued under a judgment on the first bond, and a stay of proceedings ordered on the 29th in consequence of some treaty between the guardians of the poor and the defendants.

On the 12th *May* 1804, *Joseph Bispham,* by an indenture of that date, reciting his inability to pay his debts, and his desire to give his creditors all the satisfaction in his power, in consideration thereof and of one dollar, assigned to the plaintiffs, with the previous assent of at least one of them who was a creditor, all his estate real and personal " in trust " and to the intent and purpose that they should, as soon as " reasonably might be, convert the same into money, and " pay and distribute the proceeds thereof, their reasonable " charges being first deducted, to and amongst all and singu- " lar the creditors of the said *Joseph Bispham, who should* " *within four months from the date thereof, execute a general* " *release of all demands against him,* in an equal and rateable " manner, according to the amount of their respective debts, " yielding the surplus if any to him the said *Joseph Bispham,* " his executors," &c. The assignment was acknowledged on the morning of the 14th *May;* and *Bispham* then gave notice to his creditors, the guardians of the poor among the number, to attend a meeting on the evening of that day. All but one or two of the creditors met pursuant to the notice. *Bispham* explained the situation of his affairs, and produced the

assignment, the terms of which were agreed to without a dissenting voice. He then immediately delivered to the plaintiffs the key of the store containing his goods, and at about *eight o'clock in the evening* the proceedings closed.

On the same evening the attorney for the guardians of the poor confessed a judgment in the Common Pleas against *Lawrance* and his sureties on the second bond, and about *ten o'clock at night* delivered a *fi. fa.* to the sheriff. The next day, as the assignees were removing the goods, the defendant made a levy and took them into his custody, shortly after which he received a formal notice of the plaintiffs' claim. On the 20th, but not before, a release conformably to the assignment was executed by most of the creditors, including the plaintiffs, and on the 23d the sheriff sold.

Upon these facts a verdict was found for the plaintiffs, for the nett amount sales and interest, subject to the opinion of the court upon the following points reserved:

1. Whether the assignment in question was fraudulent and void, or vested any property in the plaintiffs until after the levy.

2. Whether the goods in question were bound from the *teste* of the *fi. fa.* by relation.

3. Whether by the act of 29th *March* 1803 the goods were bound from the filing of the second bond on the 10th *June* 1803.

4. Whether under the circumstances of the case trespass was maintainable.

The questions were argued at *March* term 1805; but the court being divided, the first and fourth points were again argued at the present term. The second and third were abandoned by the defendant's counsel, in consequence of what had previously fallen from the bench.

*Sergeant* and *Hallowell* for the plaintiffs. Since the case of *Wilt* v. *Franklin* (a), all the objections to this assignment are reduced to the single point of the *release;* and under this head it is argued, *first* as a general principle, that the deed is void because it stipulates for a release; *secondly* that the operation of the deed was suspended until a release was

(a) 1 *Binn.* 502.

signed by at least one creditor, which did not take place un-
til after the execution.

The general principle gives rise to important considera-
tions; but in application to this case the answer is easy.
The clause of release was not a condition upon which
the estate was to pass, but a designation of the objects
who were to enjoy it. Whether the creditors would come
in, depended not upon the debtor, but upon themselves;
and if a presumption exists that as many would come in as
the property would satisfy, then no objection lies against
this more than against an assignment to particular creditors,
which is sanctioned by the Chief Justice in *Wilt* v. *Franklin*,
and by the King's Bench in *Holbird* v. *Anderson* (a) and in
*Nunn* v. *Wilsmore* (b). But the distinguishing feature of this
case is, that the release was agreed to by the creditors be-
fore the delivery of the assignment. The proceedings at the
meeting were a contract by the creditors, in consideration
of the assignment; and if the release was even a condition,
that condition was accepted. A debtor may assign to *A*. and
*B*. exclusively. If *A*. and *B*. think proper to accept the as-
signment on the condition of a release, how does this cir-
cumstance confer an authority on other creditors to defeat
it? If it does not, still less can a single creditor overthrow
an assignment accepted by all the others, and which was as
open to him as to them. Compositions are precisely like this
kind of assignment, as to their legal effect. They are agree-
ments by creditors to give up the remainder of a debt, upon
receiving a part; and the case of *Butler* v. *Rhodes* (c) shews
not only that they are valid, but that they are favoured, and
that courts will hold creditors to their part of the agree-
ment. But upon general principles, the release is not frau-
dulent. The clause has been in common use among commer-
cial men in this state. Titles depend upon assignments of
real estate which contain it. It takes the place of those pro-
visions which in bankrupt laws or some other shape, in all
countries but our own, shelter the debtor from the persecution
of a rapacious creditor; and it is for the benefit of the credi-
tor, because it induces the debtor to make an early assign-
ment. The statutes of *Elizabeth* are not against it; they are
against nothing but cheating. The spirit of the bankrupt

(a) 5 *D. & E.* 235.          (b) 8 *D. & E.* 529.          (c) 1 *Esp. Rep.* 236.

laws coincides with it; they give a part to every creditor, and a discharge to the debtor. It may be argued that, the release being a condition, nothing passes to the creditors until performance, and therefore there is delay. But if the time is not too long, and it is obviously proper to allow some time for notice, the delay is not fraudulent, which it must be to defeat the deed. Every assignment must in this respect stand by itself. The delay is not under any circumstances for the benefit of the debtor; he would prefer an instant release; and as to his withdrawing his property from execution in the meantime, it is for the benefit of all the creditors, and he could produce the same effect by selling and converting into cash. So also he might produce a release from some by giving them property in full, which is all this deed can compel. The resulting trust to the debtor is of no consequence, it is no more than the law would imply; and if, as is said, it is an equity which may be taken in execution, the objection to it is still weaker. [TILGHMAN C. J. Was there any thing to shew what proportion this property bore to the debts? A debtor may assign a large sum to pay a small one, and so elude his creditors.] There is no doubt the property would not pay the debts. If fraud had been intended, certainly the assignment would be bad; but the defendant's argument is, that where none is intended, still the clause of release is a fraud in law.

That the property so vested in the plaintiff as to make the levy unlawful, can hardly be doubted. Both property and possession passed by the delivery of the assignment and the key. The trust existed, though no person was then qualified to take as *cestui que trust;* and so it is in the case of settlements upon unborn children, and in contemplation of marriage. The legal estate was conveyed to serve the use when it should arise; and in fact there was a present trust to sell. There was no condition annexed to the legal estate, but merely to the benefit of the trust afterwards; so that if no creditor came in, still the estate passed, and could not be disturbed by execution. If however the condition applied to the legal estate, it was performed by the agreement of the creditors before execution. There is no difference in equity between an agreement to do a thing, and doing it. The creditors who then assented, could not afterwards refuse the re-

VOL. II.                    Z

1809.

LIPPINCOTT
v.
BARKER.

1809.

LIPPINCOTT
v.
BARKER.

lease, and did not; if they had sued the debtor, it follows clearly from the case of *Butler* v. *Rhodes*, and from the opinion of the Court in *Heathcote* v. *Crookshanks* (a), that he might have pleaded the circumstances in bar.

. The objection to the form of action has no weight. The sheriff in levying an execution, acts at his peril. He is ordered by his writ to levy on the goods of *A.*; if he levies on those of *B.*, he is a trespasser, and is liable in the same form as another. *Hallet* v. *Byrt* (b). There is no analogy between this, and the cases under the statutes of bankrupt, where it has been held that the sheriff is not to be made a trespasser by relation. Here the property was actually transferred at the time of levy, and he had notice of it, which does not leave him even the excuse of ignorance.

*Levy* and *Tilghman* for the defendant. The clause of release is on general principles contrary to the law of *Pennsylvania*, and fraudulent. The debtor was not entitled by law at the time of assignment to a discharge from the debt, but merely to a liberation of his person; he therefore violated the spirit of the law. He was under a moral obligation to pay his debts in full; the stipulation was therefore in collision with his duty. Such a provision then, being sanctioned neither by the law of *Pennsylvania* nor by morality, the statute should be carried as far as possible to defeat it. When the bankrupt law gives a discharge, it is after a thorough examination; but the debtor here makes himself the arbiter of his own rights, and stifles all inquiry. He in fact coerces his creditors. He, who is but a trustee of their property, says they shall not have the remnant of their own, unless they discharge him; which is as much an act of duress, as the conduct of the pawn-broker in *Astley* v. *Reynolds* (c). He makes the law for them, and he withdraws his property from their executions, to compel their observance of it. The delay therefore is not for the benefit of the creditors, but to obtain his discharge; for his creditors could not come in except upon this condition; and wherever the delay is intended for the benefit of the debtor, the assignment is void by the statute of *Elizabeth*. Such a clause has not been in use except since the revolution. A letter of licence was for-

(a) 2 *D. & E.* 27.    (b) *Carth.* 381.    (c) 2 *Stra.* 915.

merly the debtor's protection; and it is to be observed, that in the recent case of *Wilt* v. *Franklin*, the counsel for the assignment lay much stress upon the fact that it did not require a release. The agreement of the creditors is relied upon. That agreement was without consideration, as the assignment was previously made. Had the creditors been consulted prior to its execution, and dictated the terms, the case would have been different. But the property was already transferred, which distinguishes it from *Butler* v. *Rhodes;* and if it were not, still an agreement made at a meeting so suddenly called, where investigation was impossible, might be honestly and conscientiously retracted. In *Heathcote* v. *Crookshanks*, *Ashhurst* says, that a promise to forgive the residue of a debt in consideration of receiving a part, is *nudum pactum*, unless it is executed; and equity would never decree the execution of a contract relative to personal property under these circumstances. If it were possible that the debtor, could in some indirect way, do what he has done here, that way should be interdicted as well as this. The statute cannot receive too liberal a construction in suppression of fraud. *Cadogan* v. *Kennett* (*a*). But the thing is not possible. In no other way can he compel a release, than by conveying away his property. Where particular assignments have been supported, they have been for the benefit of the creditors, as in *Holbird* v. *Anderson*, and *Nunn* v. *Wilsmore;* not for the protection of the debtor. And on the contrary where the tendency is delay, and the object and effect to screen the property, and to keep it under the debtor's control, the deed has been overthrown, as in *Burd* v. *Fitzsimons* (*b*).

It is said that the legal estate passed by the assignment, which is sufficient to defeat the execution. This is begging the question. The legal estate and the trust are inseparable; and if the latter falls from either actual or legal fraud, the legal estate falls with it. But if the estate was valid, it does not follow that the levy was wrong. The assignment did not create an immediate use to the creditors. They were to take upon the performance of a condition. In the meantime the equitable interest resulted to the assignor, and was liable to execution according to the statute of frauds, and repeated

<div style="text-align:right">1809.

LIPPINCOTT
*v.*
BARKER.</div>

(*a*) *Cowp.* 434.          (*b*) 4 *Dall.* 76.

1809.

LIPPINCOTT
v.
BARKER.

decisions in *Pennsylvania*. What proves to a demonstration that the equity was in *Bispham*, is the possibility that no creditor would release in four months; when it would not be any where, unless in *Bispham*. An *agreement* to release was not sufficient to raise the use. The debtor provided for the *execution* of it; and the use was to be governed by the deed, and not by a verbal understanding.

If the sheriff is answerable at all, it ought ·not to be in trespass. The release of the 20th *May*, first raised an equity in the creditors; and it is by relation only that the right is in them from the delivery of the assignment. Upon these facts, the law is settled in *Smith* v. *Milles* (a) that trespass does not lie; and the reason is very plain, as the sheriff would in that form of action answer in vindictive damages, for making a levy, which, at the time, it was his duty to make.

TILGHMAN C. J. In this case there are two points for decision.

1. Is the deed of assignment from *Joseph Bispham* and wife to the plaintiffs, to be considered as fraudulent and void?

2. Does an action of trespass lie against the defendant, who was sheriff of the city and county of *Philadelphia?*

The trusts of the deed (by which *Bispham* conveyed his whole estate to the plaintiffs, and which was executed when his debts exceeded the amount of his property) were that the assignees should convert the estate into money, and divide the net proceeds amongst all the creditors of *Bispham*, who should within four months of the date of the deed, execute a general release of all demands against him, in an equal and rateable manner, according to the amount of their respective debts; and pay the overplus if any to the said *Bispham* his executors or administrators.

After the decision in the case of *Wilt and Franklin* at the last *March* term, it must be taken for granted that this deed would have been good, if the trust had been for the equal benefit of all the creditors; but the exclusion of all those who did not execute a release in four months, makes a striking difference in the present case. It is upon this exclusion principally, that the counsel for the defendant have founded their

(a) 1 *D. & E.* 475.

argument. They contend that the debtor had no right to in-
sist on so unreasonable a condition; that at the time this debt
was contracted there was no bankrupt law in force, and the
insolvent law would not have entitled him to a release, but
would only have exempted his person from imprisonment;
besides, that no debtor ought to ask for a release, till his con-
duct has been thoroughly investigated, and his integrity
made manifest; and that it is ill policy to suffer any kind of
conveyance which leads to the stifling of all inquiry. These
observations have great weight as general principles. But
the question is, how far are they applicable to the case be-
fore us? The assignment was executed on *Saturday* the 12th
*May*, and acknowledged on *Monday* the 14th *May*. On the
same day, *Monday*, in the evening, a general meeting of the
creditors was called. All but one or two met. The deed,
which till then had remained in the hands of the debtor, was
produced to them. They assented to it. The key of the
store was immediately delivered to the assignees, who were
thus put in possession of the goods. On the same night,
*after those proceedings*, the guardians of the poor entered
their judgment against *Bispham*, and took out an execution,
by virtue of which, on the 15th *May*, the defendant levied on
the goods in the possession of the plaintiffs. We perceive at
once how different this case is from that of *Burd* v. *Fitzi-
mons*, relied on by the defendant's counsel, which turned on
the validity of the assignment of Mr. *M'Clenachan.* There
the deed was executed on the 2d *September*, and no meeting
of the creditors was called till the 15th *December*, above
twenty days after the execution of *Burd* had been levied on
the land which was the subject of dispute.

It has been conceded by the defendant's counsel, that *Bisp-
ham's* deed would have been good if the creditors had been
consulted *before* its execution. Nay more, it has been con-
ceded that if any of the creditors had given a release before
the execution of the guardians of the poor was levied, such
creditors would have been entitled to a preference. I confess
I can see no good reason why the creditors should not be
entitled to the benefit of the deed, from the time they agreed
to accept it. It is objected that they were not bound by their
agreement, and that a court of equity would not have com-
pelled a specific execution of it. If the creditors had been in

1809.

LIPPINCOTT
v.
BARKER.

any manner deceived, they would have been under no obligation to stand to the agreement. But if they were fairly informed of the debtor's circumstances, and no imposition practised on them, it appears to me they were under a moral obligation to perform their part of the bargain. But the fact is that they never wished to retract; and on the 20th *May*, the release was executed. When they themselves then considered the contract as binding, and actually proceeded to execute it in a few days, why should a third person be permitted to say, that they should have no advantage of the assignment, because they were not bound by it? The case of *Butler* v. *Rhodes*, 1 *Esp. Rep.* 236, has a strong bearing on the present question. There, one of the creditors who had *verbally* agreed to a *composition*, in consequence of which his debtor had made an assignment of all his estate, was not permitted to relinquish the composition, and support an action for his debt. There is strong reason why the law should be so. If a particular creditor could abandon the assignment, and resort to his action, he would gain an unfair advantage of the other creditors, who refrained from suits on the faith of an agreement in which all had concurred. These considerations induce me to be of opinion, that those creditors who assented to the assignment on the night of the 14th *May*, are entitled to the benefit of it from that time. There is no occasion to decide whether others are entitled to the same benefit, because I understand that the debts of those who so assented, are more than sufficient to absorb the whole estate. I beg however to be distinctly understood, that my opinion is confined to the circumstances of the *present* case; for there are *many and strong* objections to deeds of assignment, made without the privity of creditors, and excluding all who do not execute releases.

As to the second point, whether the sheriff is liable to an action of trespass, there is no difficulty. The case cited from *Carth.* 381. contains my Lord *Holt's* opinion expressly on the point. He says that in writs of execution, the command of the writ being to levy on the goods of the defendant, the officer acts at his peril, and is liable to an action of trespass if he takes the goods of *another person*. The argument of the defendant's counsel was founded on a supposition, that

nothing passed by the deed of assignment until the 20th *May*, when the creditors signed a release; and that the sheriff ought not to be made a trespasser by relation. But the deed took effect at law immediately on its execution, and in equity at least from the night of the 14th *May*, when the creditors assented to it, and the key of the store was delivered to the assignees; and this was prior to the entering of the judgment of the guardians of the poor. My opinion is that judgment be entered for the plaintiffs.

YEATES J. This case was tried at Nisi Prius in *Philadelphia* on the 1st *March* 1805, when a verdict was given for the plaintiffs for 1412 dollars 49 cents, the nett amount of the sheriff's sales and interest, subject to the court's opinion on certain points reserved. Those points were fully argued before the court in *March* 1805; but the members of the court having been equally divided, no judgment was given.

They have undergone another argument this term. The first point reserved on the trial was, whether under the circumstances of this case, the assignment of *Joseph Bispham*, dated 12th *May* 1804, was valid, so as to vest the property in the assignees, or was defective, fraudulent and void?

The objections made to the assignment on the part of the defendant, have been much narrowed since the former argument. Some grounds were then insisted on, which the decision of a majority of this court in (a) *Wilt* v. *Franklin* assignee of *Keely*, and *Berthon* and Son v. *Keely*, at the last *March* term, have induced the counsel now to relinquish. It was determined in these cases, that a general assignment, made by an insolvent person to certain persons not previously nominated by his creditors, of all his property real and personal, in trust to distribute the moneys arising therefrom to and among *all* his creditors rateably in proportion to their respective debts, might be good and valid, though executed with the professed intention of defeating an execution meditated to be taken out by a particular creditor; and also, that a schedule of debtors and creditors not accompanying the assignment, did not render the same invalid. I shall there-

(a) 1 *Binn.* 513. 518.

1809.

LIPPINCOTT
*v.*
BARKER.

1809.

LIPPINCOTT
*v.*
BARKER.

fore wholly omit any observations on those grounds of objection.

It has been urged by the defendant's counsel, that by reason of the proceeds being stipulated to be paid to the creditors who should within four months execute a general release of all demands against *Bispham*, the vesting of the property was suspended until the 20th *May*, on which day the creditors executed a formal release to him; that the goods were bound by delivery of the execution at the suit of the guardians of the poor upon the judgment entered against *Bispham* on the second bond, a few minutes after 10 o'clock of the night of the 14th of *May;* and that under all the circumstances, the deed of trust was fraudulent and void, within the statute of 13 *Eliz. c. 5.* " by delaying and hindering the " creditors."

In order to form a correct judgment on this part of the case, we must attend minutely to the facts and events as they occurred.

The assignment was executed by *Bispham* and his wife in the presence of witnesses, on *Saturday* the 12th *May* 1804, none of his creditors being present, that we know of. Nothing happened on *Sunday;* but upon *Monday* the 14th *May* a general notice was given to *all* the creditors of *Bispham*, including the guardians of the poor and *Robert Erwin* his co-surety, to meet at an appointed place. It appeared that *all* his creditors attended in pursuance of the notice, except one or two at most; and that he then represented to them the situation of his affairs, and offered to them the assignment, which was acknowledged before the late Chief Justice *Shippen;* one if not both of the trustees, having previously agreed with him, to accept the intended trust. They all expressed their full consent to the terms proposed; and *Bispham* in pursuance thereof, delivered to the assignees the assignment and key of his store, the whole business having been transacted and completely closed, about 8 o'clock on the evening of that day. The possession of the goods was in the assignees, above two hours before the adverse writ of *fieri facias* was in the hands of the sheriff. I see no solid reason, why the equitable as well as legal interest in the goods in question, did not vest in the trustees, prior to the entry of the judgment and taking out the execution. The

creditors who generally met, were bound by their assent to the terms of the assignment, and could not retract therefrom on any legal, moral, or honourable principle. In *Jolly et al. assignees* of *Norton* v. *Wallis* (a), where a composition deed was entered into by an insolvent debtor, with a clause that if certain creditors did not sign the deed, it should be null and void, it was resolved, that if such creditors accepted of the composition, or the security for the composition, though they did not actually sign the instrument, it was nevertheless valid and good. Lord *Kenyon* there said, he should hold, that they acquiesced in the composition, and consented to come in under it, and that they should be bound thereby.

On the good faith of the creditors, the goods in the store were actually delivered to the trustees, as their agents, and put beyond the power and control of *Bispham*. No future election was left to them, which could be resembled to *Alderson et al.* v. *Temple* (b). So far has this matter been carried, that an assignment by a trader, while resident in *India*, of all his effects, in trust for creditors *in certain proportions*, has been held not fraudulent and void in itself, *being intended honestly at the time*, and assented to by the generality of the creditors. *Ingliss et al.* v. *Grant* (c).

It has been further urged, that this assignment, confining the distribution of the proceeds to such of the creditors as should execute a general release of all demands against the debtor within four months, was fraudulent, inasmuch as it prescribed hard and unreasonable terms, and was a species of coercion on the creditors. This matter was slightly touched, upon the first argument. But it is now said, that a man is under a moral obligation to do justice to his creditors when he has it in his power, notwithstanding any release; and that the insolvent law only liberating the person of the debtor from imprisonment, he has no right to an exemption of his future property, though he surrenders up all his estate. We must be contented to take the world as we find it. I regret that we find such few instances of refined virtue, in the payment of debts. It will be remembered however, that we

<div style="margin-left:2em">

(a) 5 *Esp.* 228. see 1 *Esp.* 236. 2 *T. R.* 24.
(b) 4 *Burr.* 2235. 2241.

(c) 5 *T. R.* 530.

</div>

*Margin:*

1809.

LIPPINCOTT
*v.*
BARKER.

are now inquiring whether the assignment on the face of it, or from extraneous circumstances, was a fraud on the interests of the creditors. They certainly were competent to judge of the proposals made to them, and should be bound by their own acts. Independently of the bankrupt laws, a debtor may (a) prefer one set of creditors to another, and such a measure would be neither illegal nor immoral. Contracts made during the existence of the bankrupt acts, must be supposed to have in view their provisions. In the case before the court, the plain object disclosed in the deed, was to put all the creditors on one common footing, without predilection or prejudice to any one creditor. On this broad basis of perfect equality, rests the whole system of the bankrupt laws. The debtor here desires no further benefit or advantage from his assignment, than he would legally have been entitled to, if those laws had been in operation. Under the 36th section of the bankrupt law of the *United States*, passed 4th *April* 1800, (b) the bankrupt who has made a full discovery of his estate and effects, and in all things conformed himself to the direction of the act, upon two thirds of the creditors in number and in value testifying their consent, is entitled to a certificate of discharge from the judge of the district, which liberates both his person and property from preexisting debts which might have been proved under the commission. The creditors here performed the functions of commissioners of bankrupt, and have closed with the proffered terms. The conclusion which I draw on the whole matter, that the assignment is valid under all the circumstances of the case so as to vest the property in the assignees, I trust, will not in any degree impair commercial credit, or fair dealing. Could I suppose, that such would be the probable pernicious consequences of my decision, I would pause a long time, before I could be induced to make up my mind on this occasion.

I deem it proper to express my sentiments on the other points reserved on the trial, although only the last point has been insisted upon in the last argument. Upon the second and third points, the former members of this court entertained the same opinion.

The second point is, whether the execution of the guar-

(a) 5 *T. R.* 424, 8 *T. R.* 528. *Prec. Cha.* 105.   (b) 5 *U. States Laws* 70.

dians of the poor bound the goods from the *teste*, against this assignment? This depends on the true construction of the act of 21st *March* 1772 (*a*). The 5th section thereof directs that " no writ of *fieri facias*, or other writ of execution, " shall bind the property of the goods *of the person*, against " whom such writ of execution is sued forth, but from the " time that such writ shall be delivered to the sheriff &c. to " be executed." This is copied *verbatim* from the 17th section of the *British* act of frauds and perjuries (*b*) 29 *Car.* 2, *c.* 31*. It is objected that this act, has always been confined to *purchasers;* and does not apply as between the parties, by the *English* decisions; and therefore considering this assignment, if valid, as a mere voluntary deed, the goods intended to be transferred thereby, will be bound by *relation* from the *teste* of the writ. But it will be remembered, that upon the third section of our law, copied from the 15th section of the same *British* statute, which contains stronger words than that under consideration, this court were of opinion, in a case stated between *Joseph Welch* and *Archibald Murray* in the term of *March* 1805, that as between mere judgment creditors, their respective judgments bound from the times of entry, and not from the last day of the preceding term. A case in *Prec. Cha.* 478 was then cited by the court, to warrant the practice which had uniformly prevailed in *Pennsylvania.* I do not say that judgment creditors are to be considered as *purchasers.* I well know that it has been determined otherwise both in *England* and here. But are not trustees, who claim under a deed expressly made to secure the honest antecedent debts of fair creditors, though a small money consideration is inserted therein to make it more formal and effectual, better entitled to the appellation of purchasers? Can the present deed be correctly considered as merely voluntary? I cannot think that a *fiction* of law should invalidate the operation of such a deed.

The third point is, whether by our law of the 29th *March* 1803, section 7, (*c*) these goods were bound from the time of filing the bond? This must rest on the true meaning of that

1809.
LIPPINCOTT
*v.*
BARKER.

---

(*a*) 1 *St. Laws* 641.     (*b*) 3 *Ruff. Stat.* 386.     (*c*) 5 *St. Laws* 514.

* Except that the words "of the person" are omitted by mistake in the *English* statute.

1809.

LIPPINCOTT
*v.*
BARKER.

law. It declares in what manner the bonds of the collectors shall be given and filed in the prothonotary's office, and then proceeds to declare, that " they shall be and operate from " the time of filing the same, as a *judgment* or *judgments* " upon the lands, tenements, *goods, chattels* and *effects* of the " said collectors and their sureties, until the final settlement " and discharge of the said collectors, for or on account of " their duplicates."

The effect of filing the bond is to make it equivalent to a judgment, as to its operation on lands and goods; but it goes no further. Now it is well known, that a judgment does not bind goods; until the delivery of an execution thereon to the sheriff; and consequently, the filing of the bond cannot outstrip the effect of a judgment. Should a different construction of this section be adopted, no man who is a collector of poor tax in the city, nor his sureties, could sell any part of their personal property, until the duplicate was finally discharged, without bringing the purchasers into jeopardy at a future day, which never could be the intention of the act.

The remaining point is whether trespass will lie by the plaintiffs against the sheriff, for taking the goods in execution at the suit of the guardians of the poor. In my idea it depends upon the consideration, whether the trust was in legal operation, at the time when the goods were levied upon. To subject a sheriff to an action of trespass, the taking must be unlawful; and persons who act *innocently* at the time, are not made *criminal by relation*, and therefore are excused from being punishable as trespassers (*a*). If the sheriff seizes and sells the goods, before he has *notice* of an act of bankruptcy of the defendant, he is excused (*b*). If he sells them after such notice, though he may be sued in trover, he is not liable in trespass. But having satisfied my own mind, and declared my opinion, that the deed of assignment was valid to pass the property of the goods to the plaintiffs, previous to the lien of the execution attaching, if I am correct on that head, the consequence must be, that the taking was *unlawful*, and the present form of action maintainable.

(*a*) 1 *Burr.* 20. 1 *Blq. Rep.* 65. 1 *T. R.* 475.
(*b*) 1 *Bla. Rep.* 205. 2 *Bla. Rep.* 829.

On the whole, I am of opinion with the plaintiffs upon all the points reserved on the trial, and that judgment should be rendered for them in this suit.

BRACKENRIDGE J. Since the argument by counsel, I have cast my eye upon a case, *Brady* v. *Shiel administratrix*, tried at Nisi Prius before the Chief Justice of the Common Pleas in *England*, and reported *Campbell* 147. The administratrix finding the effects of the deceased, her husband, insufficient to pay all his creditors fully, had called a meeting and proposed a rateable distribution, to which they at first unanimously assented. A deed of assignment with covenants to sue &c., was accordingly prepared; but upon some dispute respecting who should be the trustees, the plaintiff refused to come in under it, though he declared he should give no further trouble. The deed was afterwards executed by the administratrix, and all the creditors with the exception of the plaintiff. Under the deed, a ship, the only assets that had come to the hands of the administratrix, passed to trustees for the benefit of the trust. It was contended that the action could not be maintained, after the administratrix, in consequence of the plaintiff's assent, had parted with all the assets that were come to hand, and the other creditors had been induced to execute the deed, and accept of a composition. The Chief Justice seemed to think that this, if made out by evidence, would be a defence. He wished it were more generally known, for he believed that lawyers in the court of King's Bench were not aware it, that through the medium of a court of equity, the creditors of a *deceased* insolvent may always be compelled to take an equal distribution of assets. It was only for a friendly bill to be filed against the executor or administrator to account, after which the chancellor would enjoin any of the creditors from proceeding at law. In a note the reporter cites 4 *East* 10, where in answer to an observation from the bar, *Lawrence* Justice said, why may not a plea state that the testator was indebted to *A. B.* and *C.* in so much respectively, and that a judgment was acknowledged in trust to secure all their debts?

I will acknowledge I was not aware a court of chancery would have gone so far in *England*. But I presume it would only be where the debts were in equal degree, and had no

preference one over the other, and only in the case of a *deceased* insolvent, where the personal responsibility was gone, and the effects could not be increased or diminished by himself, that he would so compel. What would the chancellor do, or what plea would the law allow, where the insolvent himself, having in view an equal distribution, wishes to exclude a judgment from the unequal attachment of his effects? Admit that a debtor may prefer a particular creditor, may give him property in satisfaction of the debt; but the goods must not exceed the value of the debt, or must bear a reasonable proportion to the debt to be satisfied. The transfer also must be absolute, the delivery immediate. The continuance in possession is a badge of fraud.

Suppose an absent creditor whom the debtor wishes to prefer. The delivery of goods to a trustee for his use, must, I should think, be complete absolute and unconditional. Where the trust cannot but be for his benefit, and where it cannot but be, but that he will consent, his consent may be presumed. But if a condition is annexed, that he shall take the property transferred in full satisfaction of a debt, to which the property may not be equal, it does not necessarily follow that he will accept, and therefore the law cannot presume it, so as to couple even his subsequent assent with the delivery of the property. But if time is given until he returns and makes his mind known, is another creditor bound to wait the result? In what state is the property in the meantime, and how long may it remain in that state? Some of the creditors in the case before us, did previously agree to *release*, and some afterwards agreed; but all did not agree, more especially the judgment creditor. It could not be reasonably expected that he would agree. Under the trust in the case before us, the property delivered, as soon as *reasonably convenient*, is to be made into money, and the proceeds to be distributed; but *yielding the surplus* if any to the debtor himself. If it had been yielding the surplus if any to *the trustees* for the benefit of creditors who might come in under this commission, it might have removed one objection, which of itself I hold fatal. It may be said it is the same thing to the dissenting creditor, as he can levy on the surplus in the hands of the debtor, after it has been yielded to him. Could the sheriff return money levied? Is it to be pre-

1809.

LIPPINCOTT
v.
BARKER.

sumed that he would ever see it, much less that it would ever come to his hands? It would seem to me that if a disposition of effects under such circumstances as in the present case was allowable, we would have cases more perfectly analogous from the *English* reports, than any that have yet been produced. It would seem to me that nothing so far has been attempted, and that it has been left to ·the *astutia Americana* of debtors, to devise such a warehousing of effects out of the hands of the law for a time, for the benefit of particular creditors. I think it to the let and hindrance of creditors, and that such disposition is void both at common law and by statute; though not fraudulent in fact in the particular case, yet fraudulent in law, and therefore void. It is not simply the surrender of his property as satisfaction *pro rata* of his debts, that the insolvent here has in view. He couples an interest for himself in obtaining a discharge from that proportion of the respective debts which may remain unsatisfied. It is taking an undue advantage of the situation of a creditor, to impose this condition. It is immoral to exact it. *Volenti non fit injuria* if the creditor accepts, but it is making a volunteer by compulsion, and is in fact a robbery. One enlightened on the principles of moral honesty would never think of it. He would give what he had to one or more or to the whole of his creditors; but he would never think of annexing a condition precedent or subsequent to such surrender. Of such conditions a chancellor would not compel a fulfilment. I can think of nothing either morally honest or strictly legal, but the indefinite unconditional surrender of the property. Pass this boundary, and I can draw no line where an assignment shall be supported and where not. Every case must be *ad arbitrium judicis*, without principle to guide; and he must decide according to his own feeling of what is humane, or hard and uncharitable, in the case.

As to the form of the action of trespass, I have no doubt but that it is supportable. But on the ground of the assignment being in my opinion not to be supported, I am of opinion that the judgment be for the defendant.

<div align="right">

Judgment for plaintiffs.

</div>