# EUGENE LEITENSDORFER AND JACOB HOUGH-TON, *v.* JAMES J. WEBB.

VALIDITY OF PROVISIONAL GOVERNMENT OF NEW MEXICO.—The provisional government erected in this territory, upon its conquest by General Kearny, under the authority of the president of the United States, and the laws and courts established as a part of such government, were valid, and abrogated those previously existing here, so far as they were in conflict.

PROVISIONAL GOVERNMENT NOT ABROGATED BY TREATY OF PEACE.—The laws of the provisional government in force at the ratification of the treaty of peace between the United States and Mexico were not thereby abrogated, but remained in force, together with the unrepealed Mexican laws, though it would have been otherwise if the territory had been restored to Mexico by that treaty.

CESSION OF CONQUERED TERRITORY, EFFECT OF.—Upon a cession of conquered territory to the conqueror by a treaty of peace, the laws then in force there, whether established by the conqueror or previously existing, so far as they relate to the intercourse and conduct of the inhabitants, remain in force, while those which regulate the political relations of the inhabitants to the sovereign state are changed.

TRANSFER OF CAUSES FROM PROVISIONAL TO TERRITORIAL COURTS.—The legislative assembly had power to provide by statute for the transfer of causes from the circuit courts of the provisional government to the territorial district courts, without abatement, this being a rightful subject of legislation under the organic law.

INTENTION GOVERNS CONSTRUCTION OF STATUTES.—In construing a statute, the intention of the law-makers, as gathered from the purpose for which the law was enacted, or from other circumstances, should govern.

JUDICIAL POWER OF TERRITORY, WHERE VESTED.—The whole judicial power of the territorial government is vested in the supreme, district, and probate courts, and in courts of justices of the peace under the organic law, and the legislature can create no others.

EFFECT OF ACT OF JULY 14, 1851, TRANSFERRING CAUSES.—By the act of July 14, 1851, all causes then pending in the courts of the provisional government were transferred to the appropriate courts of the territory, each court determining for itself the particular causes of which it thus acquired jurisdiction. Hence the district court may assume cognizance of any cause within its jurisdiction, which was pending and undetermined in the circuit courts of the provisional government.

AFFIDAVIT FOR ATTACHMENT, SUFFICIENCY OF.—An affidavit for an attachment, stating the amount of the debt and that the attaching creditor has good reason to believe, and does believe, that the debtor has fraudulently disposed of his property to hinder, delay, and defraud his creditors, is sufficient.

CONTINUANCE OF INSOLVENT PARTNERSHIP NOTWITHSTANDING DISSOLUTION.—An insolvent partnership continues to exist, notwithstanding its dissolution, as to its joint creditors and the partnership effects.

---

Points decided.

---

FRAUDULENT ASSIGNMENT BY ONE PARTNER.—Where one partner makes an assignment of partnership effects in fraud of creditors, which is subsequently approved by his copartner, the latter is equally a party to the fraud, and an attachment may issue against both.

POSSESSION OF NOTE AS EVIDENCE OF PROPERTY.—The mere possession of a note is sufficient evidence of property in it to enable the holder to sue, especially where it is indorsed.

MEXICAN LAW GOVERNS ASSIGNMENT IN 1848.—The validity of an assignment for the benefit of creditors, made in December, 1848, is determined by the Mexican law as modified by the Kearny code. *Contra*, Watts, J., dissenting.

COMMON LAW EXTENDED TO THIS TERRITORY.—By the organic act the common law is extended over this territory, so far as it relates to the regulation and control of the proceedings of the supreme and district courts in the determination of causes.

COURT TO DETERMINE VALIDITY OF ASSIGNMENT.—In courts proceeding according to the common law, it is the duty of the court to determine whether an assignment is fraudulent in law or not.

ASSIGNMENT INVALID, WHEN, BY MEXICAN LAW.—An assignment for the benefit of certain preferred creditors, made without presenting a petition to any court or judge, without any schedule of debts or creditors, without the sentence of any court sanctioning the *cession* or *surrender*, and without any citation of creditors, is contrary to the Mexican law, and must be pronounced fraudulent in law as to creditors.

FRAUD IN LAW AS GROUND OF ATTACHMENT.—An assignment which is fraudulent in law, though not fraudulent in fact, is ground for an attachment.

VERDICT PRESUMED CORRECT WHERE NO EVIDENCE IN RECORD.—Where, upon a bill of exceptions, the record contains none of the evidence, the verdict will be presumed to have been right.

CORRECT INSTRUCTIONS NOT VITIATED BY ERRONEOUS REASONS.—Instructions which are correct in themselves will not be deemed invalid because erroneous reasons are given for them.

LEX LOCI CONTRACTUS.—The law in force at the time and place of making a contract governs its construction, unless otherwise stipulated by the parties.

VALIDITY OF ASSIGNMENT WITH PREFERENCES.—A general or partial assignment in trust for creditors, containing preferences, where no liens have attached, is valid unless prohibited by statute, or unless there is a bankrupt law in force; and, there being no law to the contrary, such an assignment is valid in this territory. *Per* Watts, J., dissenting.

ABSENCE OF SCHEDULE OF ASSETS AND LIABILITIES, ETC.—An assignment for the benefit of creditors is not invalid for want of attaching to it a schedule of assets and liabilities, and of the preferred creditors. *Per* Watts, J., dissenting.

UNATTACHED SCHEDULES SUFFICIENT.—Proper schedules of debts, assets, etc., made pursuant to the assignment and in the hands of the assignees, though unattached, are sufficient. *Per* Watts, J., dissenting.

ASSENT OF CREDITORS UNNECESSARY.—An assignment to a trustee, for the benefit of creditors, which is not fraudulent, does not require the assent of creditors to render it valid. *Per* Watts, J., dissenting.

FRAUD BY ONE PARTNER.—A fraudulent assignment by one partner, without the privity of his copartner, does not warrant an attachment against both. *Per* Watts, J., dissenting.

SEALED ASSIGNMENT BY ONE PARTNER.—Although a partner can not, without special authority, bind his copartners by a sealed instrument, yet an assignment by a partner under seal is not invalid where a seal is not essential to its validity. *Per* Watts, J., dissenting.

APPEAL from the district court for the first judicial district. The opinion of Mr. Chief Justice Baker sufficiently states the case.

*Ashurst and Tully*, for the appellants.

*Smith and Garey*, for the appellee.

By Court, BAKER, C. J.:

This case comes before us as by appeal from the district court for the first judicial district. On the thirtieth day of June, 1849, the appellee, J. J. Webb, filed in the office of the clerk of the circuit court of Santa Fe county, his petition in the usual form, his affidavit and bond, and sued out a writ of attachment against the lands and tenements, goods and chattels, moneys, effects, and credits of Eugene Leitensdorfer and Jacob Houghton, partners, under the name and style of Eugene Leitensdorfer & Co., to recover the sum of eight thousand two hundred and ninety-seven dollars and ninety-two cents, the amount of a promissory note made by said firm at St. Louis, March 1, 1848, payable to the order of Doan, King & Co. of that place, and by them indorsed to the appellee. The writ of attachment was returned to the October term of the circuit court: "Levied on all the goods, wares, merchandise, books, and credits in the store of E. Leitensdorfer & Co., and now in the possession of C. H. Merritt, sheriff, as per invoice," etc.

At the October term, 1849, the appellants appeared and filed their demurrer to the petition, which appears to have been the only steps taken in the pleadings in the case in the circuit court. At the September term, 1851, of the United

States district court, for the first judicial district, the appellee entered his motion for leave to file the papers of the case in the district court, and that the case be entered on the docket and considered a part of the records of that court, which motion was sustained.  At the March term, 1852, the appellants filed their plea under the statute, putting in issue the truth of the affidavit upon which the writ of attachment issued.  At the following term a trial of this issue was had, and a verdict was found for the appellee. Upon the trial the appellee introduced as evidence a paper purporting to be a deed of assignment from E. Leitensdorfer to H. N. Smith and Thomas Biggs, of all and singular the goods and wares and merchandise of said E. Leitensdorfer, and of all the property and effects of the late firm of .E. Leitensdorfer & Co., for the purpose of paying the creditors of E. Leitensdorfer and E. Leitensdorfer & Co. This deed bears date the eleventh of December, 1848, is signed E. Leitensdorfer and by said Smith and Biggs, and after reciting that said Leitensdorfer, as a partner in the late firm of E. Leitensdorfer & Co. is largely indebted, "and that he wishes to secure his creditors as far as his effects will extend," proceeds: "he, the said Eugene Leitensdorfer, party of the first part, has this day assigned, etc., his goods, wares, and merchandise, and all his property and effects of the late firm of E. Leitensdorfer & Co., unto H. N. Smith and Thomas Biggs, parties of the second part, *  *  *  for the use and benefit of the creditors of E. Leitensdorfer & Co."  The assignees bind themselves to sell and dispose of the property so assigned to them, and to receive and collect all property accounts and debts due the said Eugene Leitensdorfer, and due the late firm of E. Leitensdorfer & Co., and to dispose of the proceeds for the use and benefit of the creditors of E. Leitensdorfer & Co. and Eugene Leitensdorfer in the following manner—that is to say:  1. The clerks and agents now serving in the store-house of Eugene Leitensdorfer are to be paid their wages, and all arrearages due them; then after paying the actual expenses of conducting the business assigned, etc., they, the said Smith and Biggs, are to pay, as the assets are col-

lected or converted into money, all the annexed debts as being those placed in the list of preferred creditors for money borrowed or deposited, or such as Eugene Leitensdorfer may have considered more especially bound to pay, in which are the following: to Lewis and Courtney, nineteen thousand nine hundred and ninety-four dollars and twelve cents; Moodie and Simpson, seventeen hundred and forty-five dollars and fifty cents; to A. Laraux, four hundred and sixty-two dollars and thirty-three cents; and to Henry O'Neil, fourteen hundred and fifty dollars; and all other sums of money due by E. Leitensdorfer, etc., for simple deposits or money loaned without interest; and after which payment of preferred creditors, with all assets collected, they, the said Smith and Biggs, are to pay all the other creditors *pro rata* until the assets are expended. This assignment was ratified by said Jacob Houghton, as appears by the following writing at the foot thereof, viz.:

Know all men by these presents, that I, Jacob Houghton, do hereby authorize and empower Hugh N. Smith and Thomas Biggs as assignees of Eugene Leitensdorfer & Co., to use my name and sign my name in any way that it may be necessary further to use it in settling up business of the late firm of E. Leitensdorfer & Co.

Given under my hand and seal, this eleventh day of December, A. D. 1848.

          (Signed)          JACOB HOUGHTON. [SEAL.]

No schedule of the assets assigned or of the conditions was annexed to the deed of assignment. Thomas Biggs, one of the assignees, proved that the assets assigned amounted to about thirty-two thousand dollars; that some four or five days after the assignment an inventory of assets was made out. A rancho of Leitensdorfer was turned over to the assignees, but they had been unable to sell it. Some cattle of Leitensdorfer, on hand at the time, were sold for less than the expense of keeping them, so that a balance had to be paid. Before the assignment Leitensdorfer sent to Chihuahua a considerable amount of merchandise; that of the proceeds thereof he, Biggs, paid out upon orders of

appellants about fifty-one thousand dollars. A short time prior to this transaction the appellants had brought from the states merchandise to the amount of between eighty thousand and ninety thousand dollars. Smith states it at about eighty-nine thousand nine hundred forty-four dollars and sixty-six cents; besides an outfit in the way of wagons and teams, estimated at about twenty thousand dollars, making the entire cost nearly one hundred and ten thousand dollars. This outfit was sent back to the states, and was attached at Independence, Missouri, by creditors of appellants. The liabilities of the appellants at the time of the assignment were one hundred and five thousand nine hundred and forty-four dollars and four cents. There were several agents and clerks in the store before the assignment, and many depositors of money, and debts due for money loaned without interest, not named in the assignment. The assignees paid out to creditors upwards of twenty-two thousand dollars, preferred creditors being paid *pro rata* as money was collected. Agents, clerks, depositors, and creditors named in the deed only were paid. The assignment was made because creditors were pressing the payment of their demands. Smith, one of the assignees, was agent and attorney for several of the creditors, whose demands amounted to some twenty thousand dollars, and threatened to attach the property of the appellants should payment not be made. The books of the appellants, transferred upon the assignment, showed about seventy-five thousand dollars due them, but not above three thousand or four thousand dollars could be collected. The debtors held receipts, offsets, etc. Of the merchandise brought out, about forty thousand dollars' worth were sent to Chihuahua by the witness, leaving about fifty thousand dollars to be accounted for. The assignment was on the eleventh day of December, 1848. Two or three months after the return of witness from Chihuahua, the goods arrived from the states—arrived in June or July of the same year.

Smith, the other assignee, stated that some small depositors, and the clerks and agents, were paid in full. Assignment was made because creditors were urging pay-

ment. The assignee, Smith, as attorney for Lewis and Courtney, threatened to sue for them, but agreed to await the return of the Chihuahua adventure. Had threatened before the return of the Chihuahua adventure to attach the appellants' property. The Chihuahua expedition had gone as early as September or October. Understood the amount of goods brought out in the summer of 1848 was eighty-nine thousand nine hundred and forty-four dollars and sixty-four cents. Lewis and Courtney and Moodie and Simpson were preferred as creditors because they had assisted appellants in Independence when they were in difficulty. The deed of assignment was written out to be submitted to some other parties before signing, some short time before its execution. There was some other testimony, but it is not necessary to state it.

Appellants' counsel requested the court to instruct the jury:

1. That as the assignment was the act of Leitensdorfer alone, with which Houghton had nothing to do, the act of one defendant would not authorize an attachment against two, and their verdict must be for the defendants.

2. Also the deed of assignment was not fraudulent in law, and unless the jury find from the evidence that, in fact, at the time of the commencement of this suit, the plaintiff had good reason to believe that the defendants had fraudulently disposed of their property and effects, so as to hinder, delay, or defraud their creditors, they must find for the defendants.

3. Also that the plaintiff had shown no title to the note sued on, in himself, he had no authority to sue, and the jury must find for the defendants.

4. Also that if the assignees of the defendants had erred in paying off any of the creditors of the defendants, no advantage could be taken of that matter in this suit, but it could only be complained of by the party injured thereby in a suit against the assignees.

The court refused all these instructions, except the fourth, which it gave, and further instructed the jury:

1. That said deed was fraudulent in law, for want of a schedule thereunto annexed by the assignees of the prop-

erty and effects conveyed to them by the defendants; and because of the want of a schedule thereunto annexed of the preferred creditors, and because of the preference given to some creditors by said deed; that if the jury found from the evidence that the defendants, or either of them, had fraudulently disposed of their property and effects, so as to hinder, delay, or defraud their creditors at the time of the commencement of this suit, they must find for the plaintiffs; that the execution of said deed by Leitensdorfer, unaccompanied by proper schedules, was such a fraudulent disposition in law as aforesaid.

2. That the commission of a fraud in law by defendants, or either of them, without any fraud in fact, or without any intent to defraud, was as sufficient cause for attachment as the commission of a fraud in fact, or with intent to commit a fraud.

3. That on the trial of this issue it was not necessary for the plaintiff to show himself a creditor of the defendants, further than is shown in the affidavit, to entitle him to a verdict in his favor on this issue, on the truth of the affidavit, that the sole issue was whether the defendants, or either of them, at the time of the commencement of this suit, had fraudulently disposed of their property and effects, so as to hinder, delay, and defraud their creditors.

To the refusal to give the first, second, and third instructions, and to giving the instructions above given, appellants excepted. The jury returned a verdict for the plaintiffs, and the defendants pleaded to the merits. The appellants moved to set aside this verdict, and that a new trial might be granted, and the motion was overruled by the court. Whereupon a trial was then had upon the merits, and a verdict rendered for the plaintiffs.

The defendants moved to set aside this verdict, and that a new trial might be granted, which motion was also overruled by the court. The defendants then moved in arrest of judgment, and this motion was likewise overruled by the court. Sundry bills of exception were taken by the defendants to the ruling of the court, and filed of record in the cause. Appellants assign the following errors: 1. The

district court erred in placing the cause upon its docket. 2. The district court erred in overruling the motion to set aside the verdict on the first issue. 3. The court erred in overruling the instructions asked for by the defendants. 4. The court erred in giving the instructions asked for by plaintiff. 5. The court erred in overruling the motion in arrest of judgment. 6. The court erred in overruling the motion for a new trial on the second issue.

As to the first point: By the second section of the act of the legislative assembly, entitled "an act perpetuating and declaring in force acts, orders and laws, and for other purposes, passed July 14, 1851," it is provided that all bonds, writs, and processes that have remained in force shall be carried to a final decision in the courts established by the legislative assembly, to the same effect as they would have been in the courts previously existing: See Acts, 176.

The third section of the act of the legislative assembly defining the judicial districts, assigning the judges and fixing the times and places of holding the respective courts, passed July 10, 1851, provides that any judge of either district shall have power at any time, at his discretion, to hold a special term of the circuit court in any county of his district, etc.: See Acts, 119, 120. An act amendatory to this last act was passed on the twentieth of July of the same session, wherein, after a recital in the preamble, "whereas, among other things, the word circuit is used in the third section of said act instead of district, it is enacted, section 1, that the word circuit wherever found in the third section of said act shall be so construed and understood to mean district." These acts, and parts of acts, being *in pari materia,* must be taken and construed together. It is insisted on behalf of the appellants, that the district court had not power under these acts to take jurisdiction of this case: 1. Because the legislative assembly had no authority to pass the act providing for the transfer of the cause. 2. Because, if it had such power, it has not properly exercised it. In other words, that these acts are not sufficient to effect that purpose. Before considering these points, it is proper to dispose of a preliminary objection raised on

the argument of the cause, viz., that the circuit court of Santa Fe county was not a court in contemplation of law, and hence this cause never had a legal existence.

In the year 1846 a conquest was made of this territory by the Americans under General Kearny. The civil government then existing here having been completely overthrown and destroyed, a provisional or temporary government was established in its stead by the conquering general, under and by authority of the president of the United States, as commander-in-chief. This was recognized and sanctioned by the law of nations. By that authority the circuit courts were established, their jurisdiction vested, and the proceedings therein regulated; but it is insisted that upon the establishment of peace, the authority to establish such courts ceased to exist, and that such courts must necessarily cease with the power that created them. By the act to establish the temporary government, act 4, section 1, it is provided that the judicial power shall be vested in a superior court and inferior tribunals to be established by law; section 2, that the superior court shall consist of the judges appointed by the president of the United States. The judges * * * shall hold court at such times and places and perform such duties as shall be prescribed by law. By section 18—tit. Courts and Judicial Powers—it is further provided that the judges of the superior court shall be *ex officio* judges of the respective circuit courts. By the eighteenth section the jurisdiction of the circuit courts is thus defined: "The circuit courts in the several counties in which they may be held shall have power and jurisdiction as follows: 1. Of all criminal cases that shall not be otherwise provided for by law. 2. Exclusive original jurisdiction in all civil cases which shall not be cognizable before the prefects and alcaldes."

Here, then, we have established by competent authority a temporary or provisional government, consisting of legislative, executive, and judicial powers. Upon the conquest it was competent for the president to have abrogated all laws then existing in the territory; this power, however, he did not exercise, save so far as the laws adopted here by

his authority were inconsistent with the existing Mexican laws. On the contrary, it is provided by the first section, under the title "Laws," that all laws heretofore in force in this territory which are not repugnant to or inconsistent with the constitution of the United States and the laws thereof, and the statutes in force for the time being, shall be the rule of action and decision in this territory. There is no question, then, as to the validity of these laws and these powers thus established and acknowledged by the conqueror. Up to the time of the ratification of the treaty of peace between the belligerent powers, the unrepealed Mexican laws and those adopted by the conquering power were the laws existing in the country upon the restoration of peace. What effect did the re-establishment of peace have upon these laws? Did the laws adopted by authority of the United States instantly cease, and the repealed Mexican laws as suddenly revive? Had the territory been surrendered to Mexico under the treaty, the *jus postliminii* would have operated, and the laws adopted and the changes in government made by the conquering power would have been abrogated, and the Mexican laws restored to their former force and effect. "The right of the *postliminii*," says Vattel, "is that in virtue of which persons and things taken by the enemy are restored to their former state on coming again into the power of the nation to which they belonged:" Vatt., b. 3, c. 14, sec. 204.

But the territory having been retained by the United States under the treaty, the *jus postliminii* could have no operation, and it is believed it can be clearly shown, both by reason and authority, that these laws, just as they were at the ratification of the treaty of peace, remained in full force and vigor until they should be repealed by the conquering power. The law of nations on this subject is stated with clearness by Chief Justice Marshall in delivering the opinion of the supreme court in the case of *The American Insurance Co. et al.* v. *Canter*, 1 Pet. 541. That case went up from the district court of the United States for the territory of Florida, and involved to some extent the question of the force of the Spanish laws in that terri-

tory.   He says the usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territories as a mere military occupation until its fate shall be determined at the treaty of peace.   If it be ceded by the treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed, either on the terms stipulated in the treaty of cession or on such as its new master shall impose.   On such transfer of territory it has never been held that the relations of the inhabitants with each other undergo any change.   Their relations with their former sovereign are dissolved and new relations are created between them and the new government that has acquired their territory.   The same act which transfers their country transfers the allegiance of those who remain in it, and the law which may be denominated political, is necessarily changed, although that which regulates the intercourse and general conduct of individuals remains in force until altered by the newly-created power of the state.   Upon the transfer of the country then under the treaty of peace, all the laws which regulated the intercourse and general conduct of individuals remained unchanged, as well those adopted under the authority of the United States, as the unrepealed Mexican laws, and none but those which were political in their nature, such as affected their relations with their former and their connections with their new sovereign, were changed.

Such being understood to be the law, it is deemed unnecessary to consider the power of the president in respect to the government of the territory after the treaty of peace and previous to the passage of the organic law.   First, then, as to the power of the legislative assembly to pass the act providing for the transfer of causes from the circuit court to the district court.   This objection seems to be without force. Could the congress of the United States have passed a law authorizing such transfer ?   That body, in legislating for the territories, exercises the combined powers of legislation which are vested in the state and the federal government.   There is certainly nothing in the constitution of the United States, or in the nature of the subject, to prohibit the passage of such

a law. If congress, then, could pass such a law, it could confer that power upon the legislative assembly, and it has done so in the organic law to a very enlarged extent.

It is declared in the seventh section of that law: "The legislative power of the territory shall extend to all rightful subjects of legislation consistent with the constitution of the United States and the provisions of this act." The transfer of these causes, and thus virtually reviving them, was a rightful subject of legislation not inconsistent with the constitution or the organic law. It is no more than the providing for the revival of an abated suit. As for the transfer of a cause from one jurisdiction to another for trial, acts of legislation similar to this are to be found in the statutes of almost every state in the union.

2. Do the acts of the legislative assembly above quoted authorize the district court to take jurisdiction of these causes? In endeavoring to arrive at the true construction of statutes which may be of doubtful meaning, it is safe to be guided by the well-established rules which govern such construction. Such construction ought to be put upon a statute as best meets the intention of the makers, which intention is sometimes to be collected from the cause or necessity of making the statute, and sometimes from other circumstances; and when such intention can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction seem contrary to the letter of the statute. A thing which is within the intention of the makers of a statute is as much within the statute as if it was within the letter, and a thing which is within the letter of a statute is not within the statute, unless it be within the intention of the makers, and such construction ought to be put upon it as does not suffer it to be eluded: 6 Bac. Abr. 1, 5, 10, p. 379; 15 Johns. 379 [*People* v. *Utica Ins. Co.*, 8 Am. Dec. 243]; 12 Mass. 385; 1 Bl. Com. 61; 1 Kent Com. 461. If the meaning of a statute be doubtful, the consequences are to be considered in the construction: 6 Bac. Abr. 391.

What was the cause or necessity of making the statutes before quoted? A court which had been legally established,

with jurisdiction of causes of a class to which this case properly belongs, had, upon the taking effect of the organic law, ceased to exist, leaving unsettled a number of cases then pending, involving rights and interests to a large amount, no provision for them having been made in the organic law.   To provide that these causes should not absolutely and finally abate, was a rightful subject of legislation.   It is clear, that the district courts, established by the organic law, are the only courts in the territory to whose jurisdiction these cases properly appertain.   It is equally clear that the legislative assembly did not intend that these causes should absolutely and finally abate.   And we must presume (exercising reason and discretion) that it intended that they should be transferred to and disposed of by a court of competent jurisdiction.   By the tenth section of the organic law it is provided, that the judicial power of said territory shall be vested in a supreme court, district courts, probate courts, and justices of the peace.   Here is the whole judicial power of the territory.   In the same section it is provided, that "the jurisdiction of the several courts herein provided for, both appellate and original, and that of the probate courts and justices of the peace, shall be as limited by law."   A part of the jurisdiction of the district courts is defined and limited by the organic law, which gives it the combined jurisdiction of both the circuit and district courts of the United States.   Another portion of its jurisdiction is defined and limited by the Kearny code and by subsequent statutes, and among these are the statutes before quoted, providing for the transfer of these causes from the old circuit courts, and for their final disposal in the district courts.   It must be presumed that the object of the legislative assembly was neither unjust, contradictory, nor absurd.   It is true, the language used in the statute is not the most felicitous that might have been used for the expression of its obvious intention.   Nevertheless, it is sufficiently so to lead, under the recognized rule of construction, to a satisfactory comprehension of the meaning intended to be conveyed.

The object of a law may sometimes be ascertained by

reference to the title or to the preamble. The act of July 14 is entitled, "An act declaring in force acts, orders, and laws, and for other purposes." The second section provides that "all bonds, writs, and processes that have remained in force, shall be carried to a final decision in the courts established by the legislative assembly to the same effect as they would have been in the courts previously existing." As the legislative assembly had no power to establish courts, and it is clear beyond doubt that its intention was that these cases should be carried to a final decision, it seems equally clear that this final decision must be in the newly established courts, to whose jurisdiction these cases properly belong, or else the legislative act must be adjudged an absurdity.

In taking cognizance of these cases, there can be no difficulty. Each court is competent to determine its own jurisdiction, and whether any particular case from the former courts properly falls within it, and to take or decline the same accordingly. Nor is there any well-founded doubt as to the meaning of the words of the statute, "the courts established by the legislative assembly." The whole judicial power of the territory had been vested in certain courts, specified in and created by the organic law. The legislative assembly must be presumed to have known that it had no power to create or establish courts, in the proper sense of these terms. It had, only a few days before the passage of the act now under consideration, on the tenth of July, passed the act "defining the several judicial districts, assigning the several judges to their respective districts, and defining the times and places of holding courts." The third section of this act provides that any judge of either district shall have power to hold a special term of a circuit court in any county in his district. Here the legislative assembly, in using the words circuit courts, committed an error of which it seems it afterwards became sensible; and to remedy which, it passes the act of the twentieth of July, already mentioned. In the act of the fourteenth of July, the word established, in the sentence, "the courts established," is in the past tense, and must be

taken to refer to an act then already passed; and as the act of July 10, was the only act which had then been passed upon the subject, to it alone could reference be had. The legislative assembly may have supposed, however, that the act of organizing districts, assigning the judges, and fixing the times and places of holding the courts, was in some way an "establishing of courts," and was hence led to use these terms in the act of July 14. Such an error would, however, in no degree weaken the force of the act. If these cases can be carried to a final decision in the courts only established by the legislative assembly, as is contended on the part of the appellants, then, as the legislative assembly has created and can create no courts, it follows that its legislation touching this subject must be treated as a nullity. This would be to violate the well-established rules of construction applicable to the facts of the case.

3. As to the refusal to set aside the verdict on the first issue: This issue involved the truth of the affidavit on which the attachment issued. The affidavit contained all that was required to authorize the writ to be issued: the amount of the debt; that the plaintiff had good reason to believe, and did believe, that the defendants fraudulently disposed of their property and effects so as to hinder, delay, and defraud their creditors, in the language of the act. The defendants, by their plea, say that at the time of the institution of suit, etc., they, the said defendants, had not fraudulently disposed of their property and effects so as to hinder, delay, or defraud their creditors. Such is the issue, and it involved simply the question whether or not they had made such a disposal of their property and effects, and nothing more. The justice of this decision of the court depends upon its ruling in refusing and giving instructions to the jury. These instructions have already been inserted herein. There is no direct proof of the dissolution of the partnership, although it is inferable from the instrument of assignment and the testimony of some of the witnesses. The rule of law is, that when a partnership once exists, it continues to exist as to its creditors, notwithstanding it may have been regularly dissolved as between the mem-

bers; and also, in case of the insolvency of the concern, as to the partnership effects; and the partnership estate can not be used in a manner inconsistent with the winding up of the concern.   Hence, notwithstanding a dissolution of the firm may have taken place between Leitensdorfer and Houghton, they still were partners as to their joint creditors, and also, being insolvent, as to the partnership estate.   The deed of assignment, it is true, is made on the one part by Leitensdorfer alone; but it recites that he, as a partner of the firm of Leitensdorfer & Co., is largely indebted, and then proceeds to convey all of his own goods, wares, and merchandise, and also "all his property and effects of the late firm of E. Leitensdorfer & Co."   It appears to have been executed on the eleventh of December, 1848, and on the same day (and, it is presumable, at the same time) Houghton, the other member of the partnership, naturally ratified this act of Leitensdorfer by indorsing on the assignment, in writing, under his hand and seal, his authority to the assignees named in the deed, to use his name in any way that it might be necessary for them to use it in settling up the business of the late firm of E. Leitensdorfer & Co.   Thus Houghton, by empowering the assignees to use his name for all the purposes contemplated by the assignment, sanctions the acts of Leitensdorfer, and so far as these tend to hinder and delay or defraud the creditors of the firm, becomes equally implicated with him in a suit against partners.   All the members must be joined, for they are so far considered as but one person.

The act of one partner touching the partnership concerns, is the act of and binds all the members of the firm; so the fraud of one partner, in respect to the partnership estate, affects all the others, and especially where it is with their privity or consent.   If this were not so, it would be impossible to make the attachment process effectual against any partnership, however grossly fraudulent its acts might be, so long as there should be one honest member of the concern.   The first instruction asked for is not law, and was properly refused.   The first part of the second instruction asked for by the appellants will be considered in connection

with the instructions given, the remaining part of the instruction having been subsequently given in substance.

The third instruction was properly overruled. The mere possession of the note was sufficient evidence of property in the same to entitle the holder to sue, especially when indorsed as this was; besides, the property in the note was not in issue on the trial of the first issue. The next instruction given by the court was, "that the deed of assignment was fraudulent in law." To determine the correctness or incorrectness of this instruction involves a consideration of the laws regulating and controlling such transactions, in force in this territory at the date of assignment. If under these it be valid, the instruction was erroneous; if invalid, it was correct. It has already been seen that the Mexican laws, as modified by the Kearny code, remained in force in the territory after the restoration of peace; and as the deed of assignment bears a subsequent date, it follows that its character must be determined by the Mexican laws so modified. The Mexican laws which regulate and control the disposition of the property and effects of insolvents and bankrupts, so far as we have been able to consult them, may be found in 5 Febrero, c. 10, p. 352; Los Suite Partidas, tit. 15, pt. 5; and in White's Recopilacion, vol. 1, pp. 170–175, and the authorities there cited.

Few proceedings are prescribed by which their property and effects may be disposed of for the payment of their debts: first, cession of property; second, *concurso*, or a meeting of the creditors of the debtors, by which the creditors secure what is due to them, so far as the amount of their property is capable of satisfying them. By the proceeding of cession, which is termed surrender in the Partidas, those who are unable to pay their debts with the property they possess, cede it to their creditors, in order that they may be paid out of it as far as it may be sufficient. This cession or surrender may be made, first, by every person who is his own master, or who is subject to the power of another not having the means of paying his debts; second, the cession ought to be made before the judge by the debtor himself, or by his attorney, acknowledging his debts,

and after a sentence has been given against him; third, it
is to be done by a petition of the debtor to the proper
judge, stating the reason upon which it is founded, accom-
panied by two memorials or schedules, one of his property
and effects, and the other of his creditors, praying that the
cession may be admitted, the petitioner being held to
merely nominal security to pay any balance that may be, if
he should become able. To authorize this proceeding,
Febrero and Palacio both say at least three creditors are
necessary, and their names must be set forth in the schedule
or list to be given by the debtor at the time of making the
cession.

The *concurso*, or meeting of the creditors, is the other
proceeding whereby creditors obtain payment as far as the
insolvent's effects will satisfy their demands, and in which
the debtor cites all his creditors, in order to be paid accord-
ing to the force and priority of the right of each.

The *concurso* differs from the surrender of property in
this: 1. Because, in *concurso*, as the only contention is
with respect to the strength and preference of the sum due
to the creditors, the amount due to each of them ought not
to be expressed in the schedule or list of creditors. 2.
Because, in the proceeding of *concurso*, each creditor is
cited individually and particularly. 3. Because bankrupts
may form a *concurso*, but can not make a cession. In re-
ference to the two modes of proceeding, Palacio says that
it ought to be observed, in order to avoid confusion and
mistake; that what is said of one appertains to the other,
and that really they are the same thing, whether under
the name *cesion de bienes*, or under that of *concurso volun-
tario y preventivo;* the first being called *cession de bienes*, be-
cause the debtor makes the cession, and the other *concurso*,
because the creditors resort to it, and that there is no
effectual difference between *cesion* and *concurso*, they are
both directed to the same end—the payment of the debts
due by the insolvent, as far as the property will go in satis-
faction of them. Such are the general rules of the Mexican
law which were applicable to and controlled the disposition
of property and effects of insolvent debtors in this ter-

ritory, at the date of assignment; if there are other and different laws bearing upon the subject, they have not been cited to us; neither have they been found.

By what authority, then, shall the validity or invalidity of this assignment be determined? By the tenth section of the organic law, it is provided that the supreme and district courts, respectively, shall possess chancery as well as common law jurisdiction. Jurisdiction is properly the power to hear and determine causes. The common law, then, at least so far as to control and regulate the proceedings of the district court in the hearing and determining of causes, has been extended over this territory by the act of congress, and that court, when it proceeds to hear and determine, must observe the course of proceeding prescribed by the common law, although the rights and liabilities of parties are to be determined according to the Mexican laws in force, and the acts of congress and of the legislative assembly applicable to the subject. In courts whose proceedings are according to the course of the common law, it is the duty of the court to pronounce upon the legal validity or invalidity of instruments of the class of the assignment in this case, and to determine all questions of fraud in law which may arise in the progress of a cause.

This is a principle which need not be supported by reference to authorities. The question, then, of the validity of this deed of assignment, when introduced in evidence, was to be determined by the court and by reference to the laws in force in the territory at the time the assignment was made. Any attempt by the appellants, by means not sanctioned by the laws then in force, to dispose of their property and effects, and which tended to hinder and delay their creditors, was in law a fraud. "The doctrines of constructive fraud" (or fraud in law), says Story, "although they may seem to be of an artificial, if not of an arbitrary character, are founded in an anxious desire of the law to apply the preventive principle of justice, so as to shut out the inducements to perpetrate a wrong, rather than to rely on mere remedial justice after a wrong has been committed:" 1 Story Eq. Jur. 280. Thus acts contrary to public

policy, to sound morals, to the provisions of a statute, etc., however honest the intention with which they may have been performed, are deemed constructive frauds, or frauds in law, and are absolutely void.  The policy of the Mexican laws in force here had prescribed certain modes in which the property of insolvents should be disposed of for the benefit of their creditors.  It is clear that the parties to the assignment in this case did not comply with the essential requisites of those laws in their attempts to dispose of the property of the appellants.  No petition was presented to any judge or court, no schedule of debts or creditors was made out and submitted, no sentence of a court or judge sanctioning a cession or surrender, no citation of creditors, general or special.  The parties to the assignment saw proper to disregard the requirements of the law in their attempt to dispose of their effects, and the ordinary consequences must follow.  The instruction of the court upon this point was therefore correct.

This also disposes of the third and fourth errors assigned, as they are based upon the ruling of the district court in giving and refusing instructions to the jury.  It is objected that the court erred in overruling the motion to set aside the verdict on the trial of the second or main issue.  It is difficult to perceive any foundation for this objection.  As the record contains no part of the evidence upon the trial of this issue, the verdict of the jury must be presumed to have been founded on sufficient evidence.  This, then, in the absence of the evidence, cures any defect that may have existed on the score of evidence.  Lastly, it is insisted that the district court should have arrested the judgment upon a critical examination of the record; and upon the best examination of the laws bearing upon the case which circumstances have permitted, I am unable to see any sufficient grounds to support this objection.  Some stress has been laid upon the reasons assigned by the district court for its instructions.  It has never been held, I believe, that if instructions be correct in themselves, they shall be deemed invalid because an erroneous reason may have been given for them.  To allow such objections to prevail would be to

lose sight of the merits of the case, and to decide it upon a mere quibble.

The common law had not, at the date of this assignment, any force in this territory; and it would violate a plain maxim of all municipal laws, that contracts must be determined according to the *lex loci*, by the law of the place where made, unless stipulated otherwise—a maxim resting upon the reasonable presumption that all men contract with reference to the existing laws.    Apply this rule to this case and we are forced to determine the character of this assignment by the Mexican law, as modified by the Kearny code.    I hold that the courts of the territory are bound to be governed in their adjudications upon rights and liabilities by the Mexican laws as modified by statute, and by no other.    We may look to other similar systems, with a view to illustrate, but not to change, the positive provisions of our own.    In Florida the Spanish law prevails under modifications.    There they look to the Spanish authorities for the law.    In Louisiana the same system prevails to a certain extent.    At one time it existed there in all its vigor.    When the territory passed under the dominion of the French, the civil law, as modified by the policy of that nation, was introduced to a certain extent, and, so far as it was inconsistent with, repealed or modified the Spanish law.    Those systems, thus adopted, prevail there at this day.    The Spanish civil law and the French civil law are derived from the same source, the Roman civil law, and are scarcely more dissimilar than the common law of New York and that of Indiana.    It would, therefore, be much more just to look at the civil law of Louisiana for rules to guide us than to the common law of any state.    I find that in the civil code of Louisiana the principles of the Mexican law in relation to insolvents and their estates are strongly supplanted.    By article 1979 of that code it is provided every contract shall be deemed to have been made in fraud of creditors when the obligee knew that the obligor was in insolvent circumstances, and when such contract gives the obligee, if he be a creditor, any advantage over the creditors of the obligor, and by article 1980 it is provided that by being in insolvent circumstances, is meant

that the whole property and credits are not equal in amount, at a fair appraisement, to the debts of the party. Such is the French and Spanish civil law as adopted in Louisiana, and it is certainly quite as strong against the transaction in this case as the Mexican law.

But whatever be the laws of other states, I am bound by the Mexican laws, as they prevail in this territory, to disregard them, and to seek elsewhere for rules to govern the case would be to legislate and not to adjudicate. I have examined the common law cases having analogy to this, and have been unable to find any one wherein an assignment has been sustained, in which it has been attempted to prefer creditors simply by a classification of their claims, without the names of those creditors or the amounts of their demands. On the contrary, in the case of *Naylor et al.* v. *Fosdick*, 4 Day, 146 [S. C., 4 Am. Dec. 187], the most strictly analogous to this, the assignment was declared void, although it was more certain in its details than this, and was accompanied with schedules. But this case is not determined by the common law. I am therefore of opinion that the judgment of the first district court ought to be affirmed.

WATTS, J., dissenting:

[His honor first stated the facts very minutely, but as they are sufficiently stated in the foregoing opinion of Chief Justice Baker, it seems unnecessary to duplicate that statement. With this exception, the following is Mr. Justice Watts' opinion in full:]

The third instruction asked for by the defendant and refused by the court, and the fourth instruction asked for by the defendant and given by the court, were immaterial to the issue then on trial, and the giving or refusing of them could not affect this case. The issue was whether Leitensdorfer and Houghton had fraudulently disposed of their property and effects so as to defraud, hinder, or delay their creditors; whether the assignees had or had not discharged their duty in making payments under the deed, could not be material to that issue. It is a well-settled principle of law that a fact alleged in a bill in chancery, and not denied

in the answer, must be taken to be true: *Conwell* v. *Claypool*, 8 Blackf. 124.  It is an equally well-established rule of pleading that every pleading is taken to confess such traversable matters alleged on the other side as it does not traverse: Steph. Pl. 216, 217.

From these authorities it seems clear that the pleadings must be regarded as having admitted and confessed the indebtedness set forth in the affidavit of Webb, in not denying it in the answer put in by the defendants to that affidavit, and hence it was unnecessary to prove a fact which was thus admitted by the pleadings to be true.  Under this view of the case, the court below committed no error in refusing to give the third instruction asked for by the defendants.

The substance of the instructions given by the court below is about this: The deed of assignment made by Leitensdorfer to Smith and Biggs is fraudulent in law for the following causes: 1. Because of the preference given to some creditors by the deed; 2. Because of the want of a schedule thereunto annexed by the assignees of the property and effects conveyed to them by the defendants; 3. Because of the want of a schedule thereto annexed of the preferred creditors, and that the execution of this deed of assignment, fraudulent in law for the causes above mentioned, sustained the affidavit in attachment, without the existence of any fraud in fact or intent to defraud.  If these instructions are in conformity with law, the verdict of the jury in the first issue was correct; if they are not in accordance with law, the court gave erroneous instructions to the jury, and the motion for a new trial should have been sustained by the court, and the overruling of the motion for a new trial was error.  The subject of preference in a deed of assignment of one creditor over another, and its effects upon the validity of the deed, has been often adjudicated upon in almost every state of the union, and some contradictory decisions may have been given, some of the apparent contradictions of which are easily explained.  It seems to be clearly established that in the absence of any statutory prohibition and of a bankrupt law, a debtor may, at any time before liens have attached upon his property, make a general or partial

assignment to a trustee for the benefit of his creditors with preference, which assignment will be valid in law against the process of creditors from the time of the execution of the deed. The following authorities will be found to support this position: *Brashear* v. *West et al.*, 7 Pet. 609–614; *Lippincott* v. *Barker*, 2 Binn. 174–186 [S. C., 4 Am. Dec. 433]; *Wilkes and Fontaine* v. *Ferris*, 5 Johns. 335 [S. C., 4 Am. Dec. 364]; *De Forest* v. *Bacon*, 2 Conn. 633, 637; *McCullough et al.* v. *Sommerville*, 8 Leigh, 416–426; *Niolon* v. *Douglas et al.*, 2 Hill Ch. 443, 446; *Smith, Wright & Co.* v. *C. C. Campbell & Co.*, Rice, 353–366; *Moore* v. *Collins*, 3 Dev. 126–134; *Pearson and Anderson* v. *Rockhill & Co.*, 4 B. Mon. 296, 297; *Cross.* v. *Bryant et al.*, 2 Scam. 37–43; *Grover* v. *Wakeman*, 11 Wend. 200–203 [S. C., 25 Am. Dec. 624]; *Hempstead* v. *Starr*, 3 Day, 340.

In this territory, there being in force no statutory prohibition against assignments giving preference to one creditor over another, and no bankrupt law, the above authorities are in point and seem to be sufficient to establish the doctrine that a deed of assignment is not fraudulent in law because it prefers one creditor to another. It is perfectly competent for the legislative assembly, if it chooses to do so, to pass an act prohibiting assignments with preference to creditors, but until such a law is passed the general doctrine must govern this case. The decisions which appear to conflict with the above-cited authorities upon the subject of preferences, are, for the most part, made under the authority of statutes of the different states which prohibit the making of assignments with preferences to creditors. Notwithstanding preferences in general assignments are good, as established by many decided cases, yet such preferences have been prohibited by the laws of several states, as follows: In New Jersey, by Act of April 1, 1836, Bers. Laws, 674; in Maine, February 23, 1820, 3 Laws, Me. 550; in New Hampshire, July 5, 1834; in Connecticut, 1828, 3 Laws, 182; in Massachusetts 1836, c. 238. In Ohio, by act of 1835 and 1838, all assignments with preferences inure to the benefit of all the creditors of the assignor; and in Pennsylvania, by act of seventeenth April, 1843, all assignments

with preferences, except for payment of wages of labor to the extent of fifty dollars, inure to the benefit of all the creditors. The doctrine of preference in all those states in which the principle of preference has not been proscribed by the statute is now viewed with strong disfavor by the courts, and the determination seems to be universal not to countenance it further than adjudged cases require: See *Boardman* v. *Halliday,* 10 Paige, 224–229; *Cram* v. *Mitchell,* 1 Sandf. Ch. 251–253.

So far as the abstract right of the debtor to prefer his creditors is concerned, the view which is now generally adopted seems to be this, that inasmuch as the claims of creditors may be meritorious in unequal degrees, and inasmuch as particular creditors have it in their power to attain a priority by legal proceedings, the preference of creditors is an allowed object or result of a debtor's assignment, but that it is not permitted to be used as a means of accomplishing ends which are not the legitimate object of a debtor's efforts. These authorities seem to be clear and conclusive in establishing the fact that the deed of assignment now under consideration is not fraudulent in law because of the preference given to some creditors.

Is this deed fraudulent in law because of the want of a schedule thereto annexed by the assignees of the property and effects conveyed to them by the defendants? The court below instructed the jury that it was fraudulent in law for the want of this schedule. This point has been decided in several of the states of the union. In New Hampshire it has been decided that a schedule containing a detailed specification of the property transferred is not necessary in general to the validity of an assignment for the benefit of creditors: *Rundlett* v. *Dole,* 10 N. H. 458.

In Connecticut a similar decision was made: *Clark* v. *Mix,* 15 Conn. 152. In Virginia a similar decision was made: *Kevan* v. *Branch,* 1 Gratt. 274. In Massachusetts a similar decision was made in the case of *Woodward* v. *Marshall,* 22 Pick. 468. In Pennsylvania a similar decision was made in the case of *Wilt* v. *Franklin,* 1 Binn. 502 [S. C., 2 Am. Dec. 474]. In Missouri a similar decision was made in the

case of *Duvall* v. *Raisin*, 7 Mo. 449. In this Missouri case a list of assets and liabilities was referred to in the deed as a part thereof, but in fact was not made out by the debtor and made a part of the deed of assignment; and the court decided that the neglect of the debtor to make out a list of assets and liabilities, referred to in the deed as part thereof, would not render the deed of assignment inoperative. If the neglect of the debtor himself to make out schedule of his assets and liabilities would not render the deed fraudulent in law, much less likely would it be, that the neglect of the assignees to make out a schedule would render the deed of assignment fraudulent in law, for the want of such a schedule. The want of such a schedule has many times been held to be, *prima facie*, a presumption of fraud: See *Stevens* v. *Bell*, 6 Mass. 339; *Pearpoint* v. *Graham*, 4 Wash. C. C. 232; *Wilt* v. *Franklin*, 1 Binn. 523 [S. C., 2 Am. Dec. 474]; *Burd* v. *Smith*, 4 Dall. 76; *Hower* v. *Geesaman*, 17 Serg. & R. 251; *Halsey* v. *Whitney*, 4 Mason, 206; *Haven* v. *Richardson*, 5 N. H. 113; *Cunningham* v. *Freeborn*, 11 Wend. 241. In this last case in 11 Wend. 241, the court says the fact that the assignment is unaccompanied with any schedule of the property assigned, or a list of the creditors to be paid, is not such evidence of fraud as will justify a court of equity in pronouncing the assignment void where the case is submitted on bill and answer, in the latter of which the fraudulent intent is denied.

The fraud in the case now under consideration is alleged in an affidavit in attachment and is denied in the answer of the defendants to that affidavit, which renders the above case one peculiarly in point. In the case above cited of *Stevens* v. *Bell*, 6 Mass. 339, the court decided that where a schedule was to be made out as soon as might be, and also an account of the debts and liabilities, which were to be arbitrated in case of dispute, the presumption of fraud was held to be removed. In the case above cited of *Pearpoint* v. *Graham*, 4 Wash. C. C. 232, the court decided that if possession of the property assigned accompany the transfer, and the transaction be in all other respects fair, the mere want of a schedule will not render it fraudulent. This opinion is also

sustained by the case of *Deaver* v. *Savage*, 3 Mo. 252 [S. C., 25 Am. Dec. 437], and also by the case of *Robinson* v. *Rapelye*, 2 Stew. 86. In the above-cited case, *Wilt* v. *Franklin*, 1 Binn. 523 [S. C., 2 Am. Dec. 474], the court say that " the want of a schedule is less suspicious when the whole of the assignee's property is conveyed for the benefit of all the creditors, than where part of it is conveyed for the benefit of particular creditors." In the case of *Emerson* v. *Knower*, 8 Pick. 63, it was decided that an assignment containing a release of the demands of creditors executing it, and providing that a schedule of the debtor's property shall be annexed as soon as may be, is valid though no such schedule is annexed, the annexing it not being a condition precedent. The authority of this case is supported by the case of *Keyes* v. *Brush*, 2 Paige, 311, in which case it was further held by the court that " if the assignor neglects to furnish such schedule, the assignee may file a bill of discovery against him, and also to obtain a delivery of the books." From these authorities it seems that the deed of assignment in this case is not fraudulent in law for the want of schedules of assets and liabilities. It is true that in the case of *Drakeley* v. *Deforest*, 3 Conn. 272, the court decided that a deed of assignment of goods, not identifying them, and referring only to a non-existing schedule for a description of them, was invalid as an instrument of conveyance; but in the same case it was also held that such a deed was effectual as a declaration of trust, and the reception of the goods by the assignee, being an assumption of that trust, constituted a sufficient consideration for the assignment. In addition to this authority upon the necessity of a schedule, the counsel for the appellee has cited to the court the cases of *The United States* v. *The Bank of the United States*, 8 Rob. (La.) 305; *Naylor and Sanderson* v. *Fosdick*, 4 Day, 146 [S. C., 4 Am. Dec. 187]; *Burd* v. *Smith*, 4 Dall. 76. In the case of *The United States* v. *The Bank of the United States*, the court does not say that the want of a schedule renders the deed void or fraudulent in l— the court only said that the absence of any schedule property assigned is evidence of fraud. In the sa

the court decided that, · considered *per se,* the absence of the schedules, though an *indicium* of fraud, would not be conclusive, and if the presumption were repelled by everything apparent on the deed, and everything proved *aliunde,* the deed would be sustained.    To say that inconclusive *indicia* of fraud constitute a fraud in law, is drawing certain conclusions from uncertain premises, which is just as inadmissible in law as in logic.

In the case of *Burd* v. *Smith,* 4 Dall. 76, many other elements besides the absence of an annexed schedule entered into the decision; two judges dissented, and the judges of Pennsylvania afterwards said that the main point decided in that case was that the assignment was void because the shares of those who did not express their assent were to be paid over to a notoriously insolvent debtor, and that there was not time for all the creditors to have notice of the assignment and express their assent within the limited time: 1 Binn. 515, 528 [*Wilt* v. *Franklin,* 2 Am. Dec. 474].    In the case of *Thomas* v. *Jenks,* 5 Rawle, 225, Gibson, C. J., in commenting on the above case of *Burd* v. *Smith,* 4 Dall. 76, says:    "Indeed the reasons of the judges are so indistinctly set forth in that case, the discrepancy of their views is so remarkable, as to render it of little value as a precedent."    The only remaining case of any authority in which the absence of a schedule was held to invalidate the deed of assignment is the above cited case of *Drakeley et al.* v. *Deforest et al.,* 3 Conn. 272.    This case was reviewed in the case of *Clark* v. *Mix,* 15 Id. 176, and the court there said:    "It is further objected that the assignment is invalid, as it referred to an instrument not then existing, and reliance is placed on the case of *Drakeley et al.* v. *Deforest et al.,* 3 Conn. 272.    In that case there was no specification or description at all of the property, but a reference to a schedule not then made, and the court held that all depended upon the schedule.    But this is an assignment of all the property of the firm in this state, excepting · household furniture, a schedule of which is to be made and ＿＿d thereto as soon as may be.    The assignment then ＿＿lete; but for the greater facility in finding the goods,

the schedule is to be made. In *Emerson et al.* v. *Knower,* 8 Pick. 63–65, there was an assignment of a quantity of leather and stock for the manufacture of boots and shoes, and of boots and shoes already made or partly made, in the hands of certain persons, with a proviso that a schedule of the property should be made and annexed as soon as may be; and the supreme court of Massachusetts held that the conveyance was good; that the annexation of a schedule was not a condition on which the validity of the assignment depended, and that the covenant was not essential, the property and the place where it was to be found being mentioned; and it is said that the words 'as soon as may be' prove that it was not considered by the parties as affecting the validity of the assignment. A similar decision was made in New York in the case of *Keyes* v. *Brush,* 2 Paige, 311, and we concur in the views taken by the court in these cases."

So far as the want of a schedule is concerned, this case of *Clark* v. *Mix,* 15 Conn. 176, overrules the case of *Drakeley et al.* v. *Deforest et al.,* 3 Id. 272; for the supreme court of Massachusetts in the case of *Emerson et al.* v. *Knower,* 8 Pick. 63-65, says that the covenant in the deed of assignment as to the schedule, was not essential; and Chief Justice Williams, in the above case of *Clark* v. *Mix,* 15 Conn. 176, says he concurs in the view taken by the supreme court of Massachusetts, in the case of *Emerson et al.* v. *Knower,* 8 Pick. 63–65. It would thus seem that the position that the deed of assignment now under consideration is fraudulent in law for the want of schedules of assets and liabilities is without authority to sustain it, except the case of *Burd* v. *Smith,* 4 Dall. 76, which, it has already been seen, ''is of little value as a precedent;'' and authorities are numerous which assert that a deed of assignment is not fraudulent in law for the want of such schedules. The court below, in this case, further instructed the jury, that the deed of assignment was fraudulent in law because of the want of a schedule thereto annexed of the preferred creditors, and because of the preference given to some creditors by said deed. The only way by which a preference

can be given is by naming the preferred creditors, specifying the amount due them, and directing them to be first paid, or by referring to them as a class in such definite terms as clearly to indicate to the assignees who are to be so preferred. Now, if this deed of assignment does indicate in the above manner who are preferred, then the deed itself is a sufficient schedule of the preferred creditors, and no other was necessary. If the deed does not so indicate who are the preferred creditors, then no preference is given by the deed, and it must be considered as a general assignment for the benefit of all the creditors, *pro rata*. To say that this deed is fraudulent in law because of the preference given, and because there is no list of the preferred creditors, is equivalent to saying that the deed is fraudulent in law because it prefers creditors, and because it does not prefer them; two propositions which can not very well be predicated of the same instrument. If the assignor, in describing his preferred creditors, indicate some with certainty, and others so indefinitely that they could not come in under the deed as preferred creditors, because of this uncertainty, it still forms no valid objection to the deed ; for where rights are multifarious, the uncertainty of one man's right can not defeat the certain right of another. Now, it is certain, without any annexed schedule, that a debit of nineteen thousand and ninety-four dollars and twelve cents to Lewis and Courtney, one thousand seven hundred and forty-five dollars and fifty cents to Moodie and Simpson, four hundred and sixty-two dollars and thirty-three cents to A. Laraux, and one thousand four hundred and fifty dollars to Henry O'Neil, is preferred ; and if this deed of assignment is in other respects valid, their rights under the deed can not be defeated, because it may be uncertain whether the simple depositors or lenders of money without interest are entitled to preference or not.

In the case of *Da Costa* v. *Guien*, 7 Serg. & R. 462, the assignment was made for the payment (among others) of all accommodation notes subscribed or indorsed for the assignors, so as to exonerate the makers or indorsers of said notes from their liability therefor. It was held, that a bill drawn

on the assignees for their accommodation, in favor of and indorsed by the drawer, and accepted and negotiated by the assignees, was within the preference given by the clause. This clause, thus held good in the above cause, is quite as indefinite as any clause in the deed of assignment now before the court. A preference may be created for a class of debts without naming the holders of these debts, and this preference will inure to the benefit of all who hold claims properly belonging to the preferred class of debts; and whether the debt of A. B. or C. D. does or does not fall within the list of the preference class seems to be susceptible of proof *dehors* the deed. In this deed of assignment there is a covenant on the part of Smith and Biggs for the making of proper schedules in ten days, and annexing them to the deed. What is the object of these schedules? The object is: 1. To let the assignees know what assets have been transferred to them, and on whom; 2. To let the assignees know what debts they have to pay, and to whom; and these objects are just as well effected with proper schedules in the hands of the assignees unattached to the deed, as if they were fastened to it with hooks of steel. The assignees are agents and trustees of the creditors, and all books, papers, and schedules in the hands of said assignees, whether attached or unattached to the deed, are open to the examination or inspection of any creditor who may wish to examine them; and it can not well be perceived how a creditor could obtain any more information from reading a schedule attached to the deed, than from reading the same schedule unattached to the deed. In this case, possession of the property assigned was given immediately, and all the property of the assignor is devoted absolutely to the benefit of his creditors, without any reservation or stipulations for his own advantage.

In the case of *Grover* v. *Wakeman,* 11 Wend. 200 [S. C., 25 Am. Dec. 624], Mr. Justice Sutherland decided, that, where the assignor parts with all control of the property, and devotes it absolutely to the benefit of the creditors without any reservation or stipulation for his own advantage, the honesty of his intention is so apparent, and the

advantage to the creditors so direct and decisive, that they can not be said to be obstructed or delayed in their remedies. Outside of the instructions of the court in this case, it is contended by the counsel of the appellee that this deed is fraudulent in law for the want of assent on the part of the creditors, or at least, of the preferred creditors. It is undoubtedly the law, that when a conveyance is made directly to creditors, in consideration of indebtedness, their assent, actual or to be presumed, is necessary. The point was expressly decided in the case of *Tompkins* v. *Wheeler*, 16 Pet. 106–119. But where a conveyance is to a trustee for their benefit, their assent, where there is nothing fraudulent in the deed, is not necessary, as appears from the following cases: *Nicoll* v. *Mumford*, 4 Johns. Ch. 523–529; *Cunningham* v. *Freeborn*, 11 Wend. 241, 249; *Halsey et al.* v. *Whitney et al.*, 4 Mason, 207–214; *Houston* v. *Nowland*, 7 Gill and J. 480, 492; *Bank of the United States et al.* v. *Huth*, 4 B. Mon. 423–437. In Massachusetts, the assent of a creditor, to render an assignment valid as against him, is necessary, as appears from the following cases: *Russell* v. *Woodward*, 10 Pick. 408; *Stevens et al.* v. *Bell*, 6 Mass. 339, 342; *Widgery et al.* v. *Haskell*, 5 Mass. 144, 154 [S. C., 4 Am. Dec. 41]. But from an examination of these cases in Massachusetts, it will be found that the decisions are grounded upon the difficulty formerly felt respecting the power of the courts in that state to compel the trustee to execute the trust; and since the passage of the act of 1836, c. 238, which gives the creditors a remedy against the trustee, the assent of creditors is no longer necessary, even in Massachusetts, as appears from the decision of the court in the case of *Shattuck* v. *Freeman*, 1 Metc. 10. The court, in the case now under consideration, instructed the jury, " that if the jury found that the defendants, or either of them, had fraudulently disposed of their property and effects, so as to hinder, delay, or defraud their creditors, at the time of the commencement of this suit, they must find for the plaintiff." This position, in the broad language here laid down, is at least doubtful authority in the present case. The affidavit asserts that Leitensdorfer

and Houghton had made a fraudulent disposition of their property and effects, so as to defraud, hinder, and delay their creditors. The answer denies this allegation, and it would seem to be, under that issue, incumbent upon Webb to prove that both Leitensdorfer and Houghton had made this fraudulent disposition of property.

If the affidavit in this case had said that Leitensdorfer and Houghton had concealed themselves, or absconded or absented themselves from their usual place of abode in this territory, so that the ordinary process of law could not be served upon them, would it have been sufficient to sustain such affidavit to prove that Leitensdorfer alone had so absconded, while Houghton remained at Santa Fe, unconcealed, and at his usual place of residence?

The proof in such a case would not sustain the allegation set out in the affidavit. That one partner should be held liable for the fraud of another, unless he was privy to it or connived at it, or by his affirmance made it his own, is a doctrine not founded in reason, justice, or law. The fraud of one partner, which entitles a creditor to his attachment, is no more the fraud of another partner than the larceny or murder of one partner is the larceny or murder of the firm. If the civil law is to be applied to and govern this case, by the civil law one partner is not liable for the frauds of the other. By that law injuries arising from the fault of any particular partner are chargeable entirely to him: See 1 Land Laws in California, Oregon, Texas, etc., 207. This position is fully sustained by the decision of the court in the case of *Pierce* v. *Jackson*, 6 Mass. 245, in which they say that a tort, or even a fraud, committed by one of the partners, will not bind the partnership, if it be not in a matter of contract, and there be no participation in it. The authority of this case is fully sustained by the case of *Sherwood* v. *Marwick*, 5 Greenl. 295. That a fraud committed by one partner in a matter of contract, or in the usual course of business, does bind the firm, is too well settled to need the citation of authorities to support it. But a fraud rendering one partner liable is not within the rule. In the *Matter of Peter S. Smith, an abscond-*

*ing debtor,* 16 Johns. 102, 109, the court says: "We have considered an attachment under the act for relief against absent or absconding debtors, as analogous to an execution; and in the *Matter of Chipman,* 14 Id. 217, we decided that it might issue where one or several partners had absconded for a partnership debt; but the sheriff can take the separate property only of the absconding debtor; he can not seize the partnership effects, for the other partner has a right to retain and dispose of them for the payment of the partnership debts." In this case the deed is under seal, and runs in the name of Leitensdorfer alone, is signed by him alone, and he describes himself as of the firm of E. Leitensdorfer & Co.

Now, whether an acting partner has authority in law, in the absence of the other member of the firm, to execute a general deed of assignment of all the partnership personal property to trustees, for the payment of the debts of the firm, though without the knowledge or consent of the other partner, is a question upon which the authorities are not uniform. The following authorities affirm such power: 3 Kent Com. 20–25; 3 Mo. 252; *Hodges* v. *Harris,* 6 Pick. 361; Gow on Part. 195; *Anderson and Wilkins* v. *Tompkins et al.,* 1 Brock. 456; *Harrison* v. *Sterry,* 5 Cranch, 289, 300; *McCullough* v. *Sommerville,* 8 Leigh, 416, 431; *Robinson & Co.* v. *Crowder, Clough & Co.,* 4 McCord, 519, 537 [S. C., 17 Am. Dec. 762]; *White* v. *Union Insurance Co.,* 1 Nott & McC. 557, 560 [S. C., 9 Am. Dec. 726]; *Hennessy* v. *The Western Bank,* 6 Watts & S. 301, 311. The following authorities deny such power: *Dickinson* v. *Legare et al.,* 1 Desau. 537, 540; *Pearpoint and Lord* v. *Graham,* 4 Wash. C. C. 232; *Hughes* v. *Ellison,* 5 Mo. 463, 466; *Drake* v. *Rogers and Shrewsbury,* 6 Mo. 317, 320. In New York it is held, that one partner may assign the partnership effects directly to creditors in discharge of their debts, but can not, without the consent of the other, make a general assignment to a trustee for the benefit of creditors with preferences: *Havens* v. *Hussey,* 5 Paige, 30; *Hitchcock et al.* v. *St. John et al.,* Hoffm. 512, 517. The weight of authority seems to be in favor of the existence of the power. The

deed of assignment in this case is under seal: See *Harrison*
v. *Jackson*, 7 T. R. 207; *Clement* v. *Brush*, 3 Johns. Cas.
180; *Van Deusen* v. *Blum*, 18 Pick. 229 [S. C., reported in
29 Am. Dec.]; *Ex'r of Fisher* v. *Ex'rs of Tucker*, 1 McCord.
Ch. 169, 171; *Posy* v. *Bullitt*, 1 Blackf. 99; *Trimble* v. *Coons*,
2 Marsh. (Ky.) 375 [S. C., 12 Am. Dec. 411]; *Cummins &
Co.* v. *Cassily*, 5 B. Mon. 74; *Blackburn* v. *McCallister*, Peck,
371; *Nunnely* v. *Doherty*, 1 Yerg. 26; *McNaughten et al.* v.
*Partridge et al.*, 11 Ohio, 223; *Doe on dem.* v. *Tupper*, 4
Smed. & M. 261. But the above general principle, that a
partner can not enter into agreements under seal, has re-
ceived this important qualification: that where a seal is not
essential to the nature of the contract, and will not change
or vary the liability, the addition of a seal will not vitiate
it; and that where an act is done which one partner may do
without deed, it is not less effectual if done by deed. This
appears to be settled in reference to agreements that
transfer an interest; and it has been decided in cases
of sales and assignments, where the property may be
transferred by delivery, such a transfer so consummated by
delivery is not annulled by being attested, or having the
trust in which it is made described by deed; and this ap-
plies to a general assignment for the benefit of creditors, to
a mortgage of chattels, and to an assignment of a chose in
action by one partner under seal: See *Anderson and Wilkins*
v. *Tompkins et al.*, 1 Brock. 456, and *Robinson & Co.* v.
*Crowder, Clough & Co.*, 4 McCord, 519–537; *Deckard* v.
*Case*, 5 Watts, 22; *Halsey et al.* v. *Whitney et al.*, 4 Mason,
207–231; *Hennessy* v. *The Western Bank*, 6 Watts & S.
301–311; *Everit* v. *Strong*, 5 Hill (N. Y.), 163; *Tapley* v.
*Butterfield*, 1 Metc. 515; *McCullough et al.* v. *Sommerville*, 8
Leigh, 416.

Thus far this case has been viewed through the lights
thrown upon it by the common law. This case of attach-
ment originated under a statute of this territory fixing a
common law mode of procedure, and the case was tried by
a jury—a thing unknown to the civil law; and the deed of
assignment was introduced merely as an instrument of evi-

dence, to sustain a statutory issue of fraudulent intent or not, and is a mere instrument of evidence. Its admissibility as evidence, and the legal effect of the instrument upon its face as a matter of evidence, would seem to be more appropriately determined by the principles and rules of the common law. The case might be different if the suit was upon the deed, or the rights of the parties under it were directly in issue; then, perhaps, the common law rules would give place to the civil law. To proceed with a case according to common law, so far as the issues are concerned, and the trial of these issues by a jury, and the examination of witnesses orally at the bar, and when written evidence happened to be introduced, to drop all the common law rules of procedure and commence a pilgrimage through the ancient civil law for our guidance, would seem to result in a mongrel mode of practice, unfavorable to the administration of justice either upon common law principles or civil law principles. The question will now be considered, whether, even by the civil law, this deed of assignment is void and fraudulent in law. At the time this deed was made, Leitensdorfer was the absolute owner of the property assigned, had it in his possession and under his control. It was not pledged, pawned, or mortgaged, and no creditor had obtained any lien upon it by attachment or otherwise. Under such circumstances, it was not contrary to the civil law for him to dispose of it; for one of the first and plainest principles of the civil law is, that the absolute ownership of property confers the right to enjoy and dispose of it as you please: See Civil Law of Spain and Mexico, J. C. Schmidt, tit. 11, art. 188, p. 45. By the civil law, fraud was treated as a crime, and was never to be presumed if there was no proof of it: Domat, vol. 1, p. 511. The rule laid down by the civil law to determine what was a fraud by a debtor upon his creditors is this: If the act of the debtor diminished the estate which he had already acquired, it was a fraud upon the creditors; if it did not diminish the estate already acquired, it was no fraud upon the creditors. Domat, in speaking of the Roman law, says, they did not look upon anything as a fraud done to the

prejudice of creditors except what was a diminution of the estate which the debtor had already acquired: Domat, vol. 1, p. 637. How this deed, which assigns all the debtor's property to the payment of his debts, can be considered as a diminution of the estate of the debtor, can not be perceived, unless the whole of anything is less than the sum of all its parts.

The doctrine of assignments is clearly recognized by Domat, vol. 1, p. 642. He says, the creditor who receives from his debtor that which is due to him commits no fraud, but does himself justice by taking care of his own interests, as it is lawful for him to do; and although his debtor be found insolvent, and because of said payment there does not remain enough to satisfy the other creditors, or there remains even nothing at all for them, he is not bound to restore what he has received for his own payment, but the other creditors ought to blame themselves for not having been as watchful of their own interests as he has been of his, who has got payment. Further, says Domat, if, " after the seizure of the goods of a debtor, or after the debtor has assigned over his goods for the satisfaction of his debts to his creditors, one of them receives payment of his debt, either out of the stock of goods that have been seized, or out of what has been made over to the creditors, he shall be obliged to share with the other creditors what he has received, because in that case he takes to himself what belongs in common to all the creditors. But this is not to be understood of what one who has seized on all the movables of his debtor may have received by means of his diligence before the other creditors have entered their actions." But it may be contended, that, admitting the right of the debtor to pay his creditors by the transfer and delivery of property, it does not follow that he could so pay or transfer his property to an attorney or trustee of his creditors. This point seems to be settled by the civil law, which says a contract may be for the benefit of a third person not party to it, whether it has for its object to liberate him from some obligation or to acquire some right: See Civil Law of Spain and

Mexico, by J. C. Schmidt, art. 432, p. 97. This deed is for the benefit of third persons, the creditors of Leitensdorfer & Co., and has for its object the liberation of Leitensdorfer & Co. from the debts as far as the property assigned will go, and also has for its object the acquisition, upon the part of the creditors, of a right to that property or its proceeds for the extinguishment of said debts as far as it will go. Domat, 695, when speaking of the several sorts of assignments, says: "And there are some assignments which are made for a valuable consideration; as if a debtor assigns a debt that is owing to him for the payment of his creditors, or if a creditor makes over to a third person, for a certain price, a debt that is due to him." Now, if a debtor can assign one debt owing•to him to pay one creditor he owes, may he not, in accordance with the civil law, assign all the debts owing to him, and all his property to pay his creditors, in the order he directs them to be paid? The distinction would seem to be a distinction without a difference. If a debtor, in accordance with the doctrine of the civil law, could pay his debt or a part of it by giving his creditor one sheep, the inference is legitimate that he might pay his debts as far as he could by the transfer of his whole flock to his creditors, or such of them as he wished to privilege. This deed of assignment, under the civil law, may be regarded as a pledge on the part of Leitensdorfer & Co. of all their property and effects to Smith and Biggs, with authority to sell the things pledged for the payment of debts, as directed in the said deed of assignment, which is evidence of the contract between the pledgor and pledgees; and Domat, 928, says: "In the case of discomfiture or insolvency the creditor who is in possession of a pledge, which the debtor had given him for his security, is preferred on that pledge before the other creditors."

It is an admitted principle of the civil law, that "no one has the right of his own authority to take possession of the property of his debtors and retain it as a pledge without previous order from the judge, unless the debtor has given him this power:" Fuero Juzgo, lib. 1, tit. 6, b. 5; Fuero Real,

lib. 2, tit. 19, b. 3; Partidas, lib. 11, tit. 13, p. 5. The converse of this proposition, upon principle, ought to be true, and the authority would then say, that any one has the right, of his own authority, to take possession of the property of his debtor, and retain it as a pledge, without previous order from the judge, if the debtor has given him this power. It would thus seem, by the civil law, that this deed of assignment is neither void nor fraudulent in law. Had all the facts connected with this deed of assignment, tending to show either a fraudulent or honest intent, been submitted to the jury for their consideration, their verdict would have been a satisfactory settlement of the issue submitted to them. Such was not the case, however. The court below, on the trial of this case, in substance told the jury that the deed of assignment was fraudulent in law, and proved the plaintiff's affidavit to be true; and they must therefore render a verdict for the plaintiff. We think the court below has taken for frauds in law circumstances only tending, *prima facie*, to prove fraud. An examination of the very many cases already cited in the progress of this opinion fully sustains this view. The defendants asked the court to instruct the jury, that "as the assignment was the act of Leitensdorfer alone, with which Houghton had nothing to do, the act of one defendant would not authorize an attachment against two, and the verdict must be for the defendants." This instruction was rightly refused to be given, upon the ground that it assumed as true disputed facts, proper to be determined by the jury from the weight of the evidence.

The defendants also asked the court to instruct the jury, "that the deed of assignment was not fraudulent in law; and that unless the jury find from the evidence, that in fact, at the time of the commencement of this suit, the plaintiff had good reason to believe that the defendants had fraudulently disposed of their property and effects, so as to hinder, delay, or defraud their creditors, they must find for the defendants." We see no objection to this instruction, and think it ought to have been given to the jury.

Opinion of Watts, J., dissenting.

Upon the other points of this case I fully concur in the opinion of the chief justice; but because of the above errors in the instructions of the court, and because of the refusal of the court below to give the second instruction asked for by the defendants, I think such error supervened as entitled the defendants to a new trial, and that the motion for a new trial should have been granted in the court below; and because it was not granted, this case ought to be reversed, and sent back to the court below for further proceedings herein.